**AUDREY H., Appellant,**

v.

**STATE of Alaska, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–12858.

Supreme Court of Alaska.

July 18, 2008.

Josie Garton, Assistant Public Defender and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee. Dianne Olsen, Anchorage, for Guardian Ad Litem.

Before: FABE, Chief Justice, MATTHEWS, CARPENETI, and WINFREE, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to two of her daughters, arguing that the superior court erred when it found that the girls were children in need of aid due to neglect and when it authorized the state to discontinue making reasonable efforts to reunite the family. Because the superior court made adequate findings to support its conclusion that the girls were neglected and were therefore children in need of aid, and because the superior court's findings that the state made reasonable efforts were made in a manner sufficiently close to that required by statute so as to avoid any harm or prejudice, we affirm the superior court's order terminating the mother's parental rights to her two daughters.

## II. FACTS AND PROCEEDINGS

Audrey is the mother of four children, including Abby, who was born in 1992, and Kit, who was born in 1996.[1] Audrey's oldest child, a daughter, was removed from Audrey's custody by Office of Children's Services (OCS) in March 2005. Audrey's youngest child, a son, lives with his father. Neither Audrey's oldest child nor youngest child is a party to this case.

In June 2005 OCS received a report of harm from staff at the girls' elementary school based on a statement by the then-nine-year-old Kit that there was not enough

---

1. We adopt the pseudonyms employed by the state and the guardian ad litem for family members involved in this case.

food in the home. In separate follow-up interviews with a social worker, both Kit and Abby stated that they felt concerned and uncomfortable with some of the people who came to the house and with the activities those people engaged in within the home. After conducting the interviews with Kit and Abby, the social worker and a police officer visited the girls' home where they observed alcohol bottles and dirty clothes piled throughout the home, and broken glass on the floor. The social worker and the police officer also noted that there was frozen and canned food in the home though the social worker observed that a bottle of milk in the refrigerator was well beyond its expiration date.

Immediately following the home visit, the social worker drafted a care and safety plan that required Audrey to undergo a urinalysis for drugs and alcohol and to clean up the house. OCS then received an additional report of harm from a school nurse who had spoken with the girls at OCS's request. The school nurse reported that Abby disclosed that while she was trying to clean the house her mother became upset and threw books at her. Abby told the school nurse she observed her mother's friends using drugs in the house, and that she had once walked in on two people naked on a bed. Abby also described seeing her mother with what appeared to be drug paraphernalia and hearing her mother discussing drugs over the phone. Abby again stated that she did not feel safe or comfortable around her mother's friends. Kit told the school nurse that everything was fine at home.

OCS removed the girls on June 8, 2005, assumed emergency custody, and placed the girls together in a foster home. The decision to remove the girls was based on concerns arising from Audrey's violent behavior toward Abby and on Abby's allegations of drug use in the home; Audrey's urinalysis had not yet come back (and it was ultimately nega-

tive). On June 9 OCS filed an emergency petition for adjudication of children in need of aid and for temporary placement. A probable cause hearing was held in July 2005 to determine whether Abby and Kit were children in need of aid. At the conclusion of the hearing the superior court found that there was probable cause that Abby and Kit were children in need of aid and that they had been exposed to neglect. The court specifically noted that "there's been a degradation in [Audrey's] ability to care for the physical environment of the home" and that as a result "the house has become almost unliveable." The court also expressed concern that the girls had been exposed to substance abuse and that the girls may have observed sexual activity, drug use, drug sales, and possibly prostitution in their home.

The superior court then turned to the question of whether OCS had made reasonable efforts pursuant to AS 47.10.086(a). The superior court found that OCS had made reasonable efforts toward the girls, but that OCS had not made reasonable efforts to identify the mother's needs. The court was particularly concerned that Audrey may have been suffering from organic brain damage from a stroke or from drug abuse, and that such brain damage may have made it difficult for Audrey to understand or comply with her OCS case plan.[2] Accordingly, the superior court found that OCS acted unreasonably by failing to secure a mental health evaluation for Audrey. Finally, the superior court found that it would not be appropriate to return the children to their home at that time.

In light of the superior court's instructions, OCS attempted to arrange a mental health evaluation for Audrey. On July 28, 2005, the day following the hearing, an OCS social worker contacted the doctor who had conducted a neuropsychological evaluation of Audrey in May 2000.[3] Although the doctor

---

**2.** In May 2000 Audrey reported to a neuropsychologist that she had suffered strokes in 1994 and 1997.

**3.** The neuropsychologist's May 2000 report indicates some skepticism regarding the nature and severity of the incidents that Audrey describes as strokes, noting, for instance, that Audrey's rec-

ords reveal "the majority of [Audrey's] complaint did not correlate with area of brain involvement indicated by MRI." The neuropsychologist concluded that "[a]lthough [Audrey's] subtle neuropsychological impairments are consistent with site of lesion, her more dramatic symptoms are not

initially indicated that her schedule was full until March 2006, an appointment was eventually made for August 3, 2005. The social worker also scheduled a substance abuse assessment for Audrey to take place at OCS's office on August 2, 2005, because Audrey was already scheduled for a visit with her children at the OCS office that day. The social worker wrote Audrey a letter indicating the time and location of the substance abuse assessment and put the letter, along with release of information forms allowing OCS to exchange information with Audrey's doctors, into a packet with a bus pass and left the packet at Audrey's home. The social worker also sent copies of the letter and the forms via certified mail and informed Audrey's attorney of all of these preparations by e-mail. On July 29 the social worker called Audrey to inform her of the scheduled time for the neuropsychological evaluation. At that time Audrey confirmed that she had received the packet containing the letter, forms, and bus pass.

Audrey failed to appear at the OCS offices for either her regularly scheduled visit with her daughters or for the drug and alcohol assessment on August 2. Audrey later explained to a social worker that she had misread the letter and had traveled directly to the offices of the center providing the drug and alcohol assessment. Audrey then informed OCS that she had made arrangements to undergo the drug and alcohol assessment at the center. Audrey also confirmed at that time that she would be ready the next morning to be picked up by OCS and transported to her neuropsychological evaluation. The social worker again informed Audrey's attorney of all of these events and arrangements. The next morning, when the social worker arrived to pick Audrey up for the appointment, she found a note on Audrey's door that read "Sorry—Not available today. [Audrey]." No one answered when the social worker knocked on the door. Audrey never explained why she missed the appointment. The social worker tried to reschedule another evaluation or at least some testing, but—after initially agreeing—Audrey ultimately decided not to go through with any testing.

Audrey missed several consecutive supervised visits with her daughters in August, causing OCS to discontinue visits. Visits recommenced in September, but were again discontinued in October after Audrey failed to appear for them. By the time of an adjudication hearing in December 2005, Audrey was not following up on referrals from OCS, was not in compliance with her case plan, and was not engaging in over-the-phone or in-person visitation with her daughters. At the end of the adjudication hearing, which Audrey did not attend, the superior court found that Abby and Kit were children in need of aid, that it would not be appropriate to return the children to their mother's custody, and that therefore the best interests of the children would be promoted by maintaining the children in OCS custody pending a disposition hearing. The superior court then asked for supplemental briefing on the question whether OCS had made reasonable efforts.

In January 2006 OCS filed a motion to discontinue reasonable efforts accompanied by a brief on reasonable efforts where the parent refuses to participate in services. Audrey opposed the motion to discontinue reasonable efforts. In February 2006 the superior court issued its order finding that OCS had not made reasonable efforts before July 2005, but that by October 2005 OCS, "by the slimmest of margins, finally achieved the low standard for reasonable efforts." Accordingly, the superior court concluded that "[f]urther efforts to provide family support to [Audrey] are no longer in the best interests of the children" and that OCS was no longer required to make reasonable efforts.

The day after issuing its order the superior court held a disposition hearing. At the hearing, OCS indicated that it intended to pursue termination of parental rights with a long-term goal of adoption. The superior court then combined the disposition hearing with a permanency hearing, noting that it did not appear to be necessary to wait another thirty days before holding the required permanency hearing. The superior court al-

consistent with observed brain lesions, and ap-

pear to be primarily psychiatric in origin."

lowed Audrey's attorney to object to this combination of the disposition hearing with a permanency hearing in order to preserve her right to request a contested hearing in the future, but there is no evidence that she ever made such a request. The court then confirmed that OCS's permanent plan was adoption and made the required permanency finding. The state filed its petition for termination of parental rights on March 10, 2006.

Meanwhile, in January 2006 both Abby and Kit were admitted to North Star hospital for mental health treatment. Both were released within a month.[4] Abby was diagnosed as having major depression with psychotic features, requiring treatment with psychotropic medication. In November 2006 OCS filed a motion for an order authorizing OCS to consent to psychotropic medication, citing the need for timely responses to Abby's doctors' recommendations and Audrey's continued unavailability. Audrey opposed this motion but eventually consented to administration of the medication by North Star Hospital. OCS renewed its motion and requested expedited consideration in February 2007 because Abby's prescriptions were running out, Audrey had not specifically consented to administration of the medication by Abby's regular doctor, and Audrey was again unavailable. Following two hearings, the superior court found that OCS could not be authorized to consent to the administration of medication, but that Abby's foster mother could.[5] The superior court denied OCS's motion, instead appointing Abby's foster mother to be her limited guardian with authority to consent to major medical treatment including the administration of medication.

The superior court held another permanency hearing in May 2007 and again found that OCS's efforts to finalize a permanent plan for adoption of Abby and Kit by their respective foster mothers was reasonable. OCS then filed an amended petition for termination of parental rights.[6] The superior court held a hearing on the amended petition in August 2007. At the hearing the court indicated that it would consider evidence in the existing records, and heard testimony from OCS that Audrey had not complied with her case plan or otherwise remedied her conduct. Following the hearing, the superior court issued an order terminating Audrey's parental rights. The superior court supported its decision by finding, by clear and convincing evidence, that (1) both Abby and Kit were subject to neglect by Audrey; (2) Audrey had not remedied her conduct and, as a result, returning either child home would put that child at substantial risk for both physical and emotional harm; (3) the state did not make reasonable efforts to reunite the family and prevent out-of-home placement before July 27, 2005, but that the state did make reasonable efforts between July 28 and October 20, 2005, and the state was relieved of its obligations to make reasonable efforts as of February 6, 2006; and (4) termination of Audrey's parental rights to Abby and Kit was in the best interest of each child. Audrey appeals.

## III. STANDARD OF REVIEW

We will sustain a superior court's factual findings in a CINA case unless those findings are clearly erroneous.[7] Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us "with a definite and firm conviction that a mistake has been made."[8] Whether a trial court's findings satisfy the relevant statutory re-

---

4. During this same month, Audrey was evicted from her home for failure to pay rent, and also lost her disability payments, leaving her without financial resources.

5. By this time Abby had been placed with a new foster family. Kit remained with the original foster family.

6. OCS had originally filed a petition for termination of parental rights in March 2006, but at the May 2007 permanency hearing the superior court instructed OCS to submit an amended petition for termination of parental rights.

7. *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).

8. *Id.* (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

quirements is a question of law that we review *de novo.*[9]

## IV. DISCUSSION

In order to terminate parental rights under AS 47.10.088 a superior court must find by clear and convincing evidence that (1) a child is a child in need of aid as defined by AS 47.10.011; (2) the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; and (3) OCS has made reasonable efforts under AS 47.10.086 to provide services to the family to prevent out-of-home placement of the child or to enable the safe return of the child. Audrey challenges the superior court's termination of her parental rights to Abby and Kit on two grounds, arguing that the superior court erred in finding by clear and convincing evidence that Abby and Kit were children in need of aid under AS 47.10.011(9), and that the superior court erred in granting the state's motion to discontinue reasonable efforts.

### · A. The Superior Court Did Not Err in Concluding that the Girls Were Children in Need of Aid.

Audrey argues that the superior court's finding, by clear and convincing evidence, that Abby and Kit were subject to neglect and therefore were children in need of aid was clearly erroneous. Audrey argues that the evidence produced at the probable cause, adjudication, and termination hearings showed that the girls were fed, clothed, and attended school, and therefore could not support a finding of neglect. The state responds that there was sufficient evidence to support the superior court's finding that Abby and Kit were subject to neglect. The guardian ad litem argues that there was evidence in the record that Audrey failed to ensure that the girls had adequate food, safe shelter, education, and dental care.

Alaska Statute 47.10.011(9) states that a court may find a child to be a child in need of aid if it finds that "conduct by or conditions created by the parent ... have subjected the child or another child in the same household to neglect." Alaska Statute 47.10.014 states that the court may find neglect of a child if the parent "fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial or other reasonable means to do so."

The superior court first determined that there was probable cause that the girls were children in need of aid in July 2005, shortly after the girls were removed from their home. The court found that "mom is not capable of doing the normal day-to-day things" and that there was "probable cause that the children have been exposed to alcohol abuse by mom and substance abuse by mom and by others." The superior court also found at the adjudication hearing[10] in December 2005 that OCS had met its burden of showing by a preponderance of the evidence that both children were children in need of aid, stating that "it is obvious that [Audrey] is not having contact with [the girls], is not being responsive to their emotional needs," and that as a result "the children have emotional damage."

Finally, in its order terminating Audrey's parental rights, the superior court concluded that "[b]y clear and convincing evidence ... each child has been subjected to neglect by [Audrey], as defined in AS 47.10.014, and thus are children in need of aid, pursuant to [AS 47.10.011(9)]."[11] To support this conclusion the superior court made several findings of fact. First, the superior court found, based on its oral findings from the July 2005

---

**9.** *Id.*

**10.** Alaska Child in Need of Aid Rule 15(a) provides that an adjudication hearing is "a trial to the court on the merits of the petition for adjudication" that "must be completed within 120 days after a finding of probable cause is entered." At the conclusion of the adjudication hearing the court is to "make findings of fact and enter a judgment that the child is or is not a child in need of aid." CINA Rule 15(d).

**11.** CINA Rule 18(b) provides that a termination hearing is "a disposition hearing to the court on the question of whether the parental rights to an adjudicated child in need of aid should be terminated."

probable cause hearing, that "[i]n June 2005 [Audrey] was incapable of caring for [Abby and Kit]. The family lived in a trailer that was extremely dirty and contained unsafe physical conditions. [Audrey] allowed others in the home to abuse alcohol and other drugs, engage in public sexual activities, including prostitution, and was unable to care for her children in any meaningful way." Second, the superior court found, based on its oral findings from the February 2007 hearing on the state's motion for an order authorizing OCS to consent to medication, that "[Abby] had become the functional parent in the household, caring both for [Audrey] and [Kit]," and that this "caused [Abby] significant emotional problems that persist to this day." Third, the superior court found, again based on its oral findings from the February 2007 hearing, that "[Audrey] remains incapable of caring for her children" due to "her own constellation of cognitive and emotional problems." The superior court also noted that those problems "have resulted in her neglecting her children (not willfully) and make it nearly certain that she would neglect them again if they were returned to her home and care." As a result, the superior court found, "[i]f either child was returned to [Audrey's] care, that child would suffer profound emotional damage and possibly physical harm ... from further neglect."

Audrey disputes the superior court's findings, noting that the June 2005 home inspection by an OCS social worker and a police officer revealed that there was food in the home. However, none of the findings that the superior court made to support its conclusions that the girls were subject to neglect and were therefore children in need of aid relied on an absence of food in the home.

Audrey also argues that the testimony of the social worker and the police officer that the home contained dirty laundry and broken glass was insufficient to establish that there were unsafe physical conditions in the home and, even if it were, there was no evidence that Audrey did not clean up the home because OCS never conducted a follow-up home visit. The unsafe conditions that the superior court noted included not only the piles of dirty clothes and the broken glass on the

floor, however, but also the dirty dishes piled in a non-functioning sink and alcohol bottles all over the home, as well as the evidence that the girls were exposed to illegal drug use and open sexual activity, possibly including prostitution, in their home. The superior court was less concerned with dangerous conditions posed by the physical state of the home and more concerned with the evidence these conditions provided that Audrey was "not capable of doing the normal day-to-day things," and was "incapable of caring for her children."

Additionally, the superior court observed that the greatest risk of harm to which the girls were exposed was the risk of emotional harm. This emotional harm included the fact that the girls, and particularly Abby, had been forced at a young age to become the primary care-givers within their home. This concern is underscored by indications that the girls assumed this role even in the face of opposition from Audrey, most notably the evidence that Audrey threw books at Abby when Abby was cleaning the home.

Therefore, although it is true that OCS did not conduct a follow-up inspection of the home, the superior court's conclusions were based less on a single observation of the physical conditions of the home and more on its overall conclusion that Audrey was not capable of caring for her daughters. The superior court was particularly concerned that Abby had been forced to assume a caregiving role far beyond what would normally be expected of someone so young, and that this responsibility had the potential to cause significant emotional damage.

Although the evidence presented may have been insufficient to establish that the girls were at risk of physical harm from inadequate food, clothing, and shelter, AS 47.10.014 also specifically states that the court may find neglect of a child if the parent fails to provide the child with the "care and control necessary for the child's physical and mental health and development." The superior court's primary conclusion was that Audrey's inability to care for her children placed them at great risk of suffering "profound emotional damage." Further, the record suggests that both Abby and Kit have

already exhibited strong evidence of emotional damage. In January 2006 both Abby and Kit were admitted to North Star hospital for mental health treatment. Abby began ongoing treatment for major depression with psychotic features. Abby's treatment has involved the use of psychotherapy and psychotropic medications.

Finally, Audrey argues that the superior court's references to Audrey's mental illness and to the girls' exposure to drug use were irrelevant to a finding under AS 47.10.011(9), and did not meet the requirements of AS 47.10.011(11) (parent's mental illness), or AS 47.10.011(10) (parent's addictive or habitual use of an intoxicant). Although it is true that there was insufficient evidence to support a finding that the girls were children in need of aid under subsections (10) or (11), the superior court's findings were made entirely under subsection (9). Audrey does not point to any case law for the proposition that the superior court may not consider evidence probative to one subsection in making a determination that a child is in need of aid under another subsection.

The superior court therefore considered the full range of evidence available to it, and made specific findings sufficient to support its conclusion that Abby and Kit were subjected to neglect due to their mother's failure to provide them with the care and control necessary for their mental health and development.[12] Because there was clear and convincing evidence in the record to support the superior court's finding that the girls had been subjected to neglect, and because this finding was sufficient to establish that the girls were children in need of aid,[13] the superior court did not err in concluding that the girls were children in need of aid.[14]

### B. The Superior Court Did Not Err in Authorizing OCS To Discontinue Making Reasonable Efforts Under AS 47.10.086.

Alaska Statute 47.10.086(a) requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents … of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home." The superior court may excuse OCS from continuing to make reasonable efforts if the court "makes a finding at a hearing conducted under AS 47.10.080($l$) that a parent … has not sufficiently remedied the parent's … conduct or the conditions in the home despite reasonable efforts made by the department in accordance with this section."[15] Alaska Statute 47.10.080($l$) describes the procedures to be followed in conducting a permanency hearing and the findings that a superior court must make in establishing the permanent plan for the child.

The superior court issued an order on February 9, 2006, finding that OCS did not make reasonable efforts before July 27, 2005, but had begun making reasonable efforts by October 20, 2005. The superior court therefore concluded that the requirements of AS 47.10.086(b) were met and granted the state's motion to discontinue making reasonable efforts.

Audrey argues that the superior court erred in two respects by issuing its order excusing OCS from making reasonable efforts. First, Audrey claims that the court had no authority to order the discontinuation of reasonable efforts under AS 47.10.086(b) "because the case was not in permanency proceedings." Second, Audrey claims that the superior court erred in finding that the state's efforts "constituted reasonable efforts sufficient to permit the state to abandon its obligations."

### 1. The failure of the superior court to make findings during a permanency hearing that excused OCS from making reasonable efforts was harmless error.

Under AS 47.10.086(b) a court may conclude that the continuation of reasonable efforts is not in the best interests of the child if

**12.** *See* AS 47.10.014.

**13.** *See* AS 47.10.011(9).

**14.** *See* AS 47.10.088.

**15.** AS 47.10.086(b).

"the court makes a finding at a hearing conducted under [the permanency hearing provisions of] AS 47.10.080($l$) that a parent or guardian has not sufficiently remedied the parent's or guardian's conduct or the conditions in the home despite reasonable efforts made by the department in accordance with this section."[16] CINA Rule 17.1(b) states that "[a]t the permanency hearing required under AS 47.10.080($l$), the court may find that a continuation of reasonable efforts is not in the best interests of the child under AS 47.10.086(b)." CINA Rule 17.1(b) also provides that "[a]ny party recommending such a finding must include the recommendation, specifying the factual basis for it, in its report for permanency hearing required by CINA Rule 17.2(c) or in a separate motion."

Here, the state filed a motion to discontinue reasonable efforts in January 2006. The state briefed the effect of parental refusal to participate in services, and asked the court "to make a finding that reasonable efforts have been provided, and for an order that the department may stop providing these efforts at the next permanency hearing, as provided by CINA Rule 17.1 and AS 47.10.086(b)."[17] This motion provided both a recommendation

to the court and the factual basis for the requested finding that "reasonable efforts have been made and should be discontinued at the next hearing." Audrey filed her opposition to the state's motion to discontinue reasonable efforts on January 30, 2006.

Rather than making its findings at the next permanency hearing—as required by AS 47.10.086(b) and CINA Rule 17.1(b), and as requested by the state in its motion—the superior court issued a written order on February 9, 2006 granting the state's motion to discontinue reasonable efforts. On February 10, 2006, the day after issuing its order, the superior court held a disposition hearing at which it also made permanency findings.[18] At the disposition hearing the state acknowledged that it had received the court's order regarding the discontinuation of reasonable efforts the day before, and indicated its belief that the court was required to hold a permanency hearing within thirty days of issuing its order permitting the state to discontinue reasonable efforts. The court, accepting the state's assertion, indicated its intention to combine the disposition hearing with a permanency hearing.[19] Although the superior

---

16. This provision, under which a court may authorize the state to discontinue making reasonable efforts, should not be confused with AS 47.10.086(c), under which a court may determine that reasonable efforts to reunite the family are not required in the first place if the court has found by clear and convincing evidence that one of several enumerated conditions is present. Such conditions include that the parent or guardian "has subjected the child to circumstances that pose a substantial risk to the child's health or safety" including "abandonment, sexual abuse, torture, chronic mental injury, or chronic physical harm"; has committed felony homicide of a parent of the child or has committed felony assault that resulted in serious physical injury to the child; or is not locatable by OCS after a reasonably diligent search of at least three months. CINA Rule 17.1(a) provides that a determination under AS 47.10.086(c) may be made at any stage of a proceeding upon a motion by a party. If the court makes such a determination in a proceeding other than a permanency hearing, CINA Rule 17.1(c) states that "the court shall hold a permanency hearing under AS 47.10.080($l$) within 30 days after the determination."

17. The state specifically stated that it was not seeking "a finding that reasonable efforts are not necessary, because these children did not suffer

any of the circumstances described under AS 47.10.086(c)."

18. According to CINA Rule 17, "[t]he purpose of a disposition hearing is to determine the appropriate disposition of a child who has been adjudicated a child in need of aid" including whether the child should be removed from her home, (CINA Rule 17(a),(d)(2)) while "[t]he purpose of the permanency hearing is to establish a permanency plan for each child committed to state custody" including whether the child should be returned to the parent, placed for adoption, or placed in another planned, permanent living arrangement. CINA Rule 17.2(a),(e)(2)-(4).

19. In making its decision to combine a disposition hearing with a permanency hearing, the superior court stated that "I know the rule says I have to do that in 30 days," an apparent reference to CINA Rule 17.1(c) which provides that "[i]f the court determines that reasonable efforts are not required under AS 47.10.086(c) in a proceeding other than a permanency hearing, the court shall hold a permanency hearing under AS 47.10.080($l$) within thirty days after the determination." Accordingly, the superior court appears to have combined the permanency hearing with the disposition hearing in an attempt to avoid holding a separate permanency hearing

court allowed Audrey's attorney to object to the court's making permanency findings at the disposition hearing in order to preserve her right to reopen the issue in the future, there is no evidence that Audrey ever challenged the findings or requested that the issue be reopened. At the February 10 disposition/permanency hearing the superior court approved the state's permanent plan of adoption and required the state to file a petition for termination of parental rights by March 15, 2006.

Audrey argues that the superior court's written order excusing OCS from continuing to make reasonable efforts was not valid because its findings were not made at a permanency hearing as required by AS 47.10.086(b). Audrey is correct that the superior court issued its order granting the state's motion to discontinue reasonable efforts to reunite the family without first holding a permanency hearing. However, Audrey misstates the facts when she claims that the superior court did not hold a permanency hearing until May 2007. Audrey also fails to establish that she suffered any prejudice or injury as a result of the court's actions.

 The superior court should have responded to the state's motion to discontinue reasonable efforts by holding a permanency hearing at which it could make the required findings that Audrey had not sufficiently remedied her conduct or the conditions in the home despite reasonable efforts made by the department,[20] and that discontinuing reasonable efforts was in Abby and Kit's best interests.[21] Instead, the superior court made these findings in its written order granting the state's motion to discontinue reasonable efforts, and then made permanency findings the following day at the scheduled disposition hearing. In its written order granting the

state's motion to discontinue reasonable efforts the superior court found that the state had made reasonable efforts by October 2005, that "there is little reason to believe that further efforts by the State to provide family support services to [Audrey] will enable her to modify her conduct or alleviate the conditions in her home that the children would be exposed to if returned there," and that "[f]urther efforts to provide family support to [Audrey] are no longer in the best interests of the children." The superior court therefore made the findings required by AS 47.10.086(b) and CINA Rule 17.1(b), albeit in a written order and not at a permanency hearing. The superior court again made findings on the state's reasonable efforts in its findings and orders following permanency hearings held in May 2006 and May 2007.

Therefore, although the superior court initially made its findings in a written order and not during the permanency hearing, it did conduct a permanency hearing on the following day, at which it extended to Audrey the chance to be heard further on the matter if she desired. In addition, the superior court's February 8 written order contained extensive findings, the accuracy and sufficiency of which we discuss below. While the superior court should have made its findings at the permanency hearing, this error appears to have been harmless because Audrey has not established that she suffered any prejudice from the court's decision to make the findings in a written order prior to holding a permanency hearing.[22] Nor can we imagine any prejudice: Audrey was heard on the issue through the opposition brief that she filed, she did not seek an evidentiary hearing when the state's motion was before the superior court, and she did not ask for a hearing after the chance to do so was explicitly dis-

---

within the next thirty days. In reaching this decision, however, the court misapplied the CINA rules. Because the state's motion to discontinue reasonable efforts was brought under AS 47.10.086(b)—requiring that the findings regarding discontinuation of reasonable efforts be made during the permanency hearing—and not AS 47.10.086(c), the thirty day deadline from CINA Rule 17.1(c) did not apply and the superior court had already erred by failing to make the findings during a permanency hearing before

issuing its order granting the motion to discontinue reasonable efforts.

**20.** *See* AS 47.10.086(b).

**21.** *See* CINA Rule 17.1(b).

**22.** *See Bennett v. Hedglin*, 995 P.2d 668, 674 (Alaska 2000) (noting "this error is harmless because [appellant] has failed to demonstrate that the [court's action] caused him prejudice").

cussed with counsel at the disposition/permanency hearing.

### 2. The superior court did not err in finding that the state had made reasonable efforts as required by Alaska Statute 47.10.086(b).

In order to permit the state to discontinue making reasonable efforts under AS 47.10.086(b), the superior court must find that the parent has not sufficiently remedied her conduct or the conditions of the home despite reasonable efforts made by OCS under AS 47.10.086(a), and that the continuation of reasonable efforts is not in the best interests of the child.[23] The "timely, reasonable efforts" required of OCS by AS 47.10.086(a) include the duty to: "(1) identify family support services that will assist the parent ... in remedying the conduct or conditions in the home that made the child a child in need of aid; (2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; ... and (3) document the department's actions that are taken under (1) and (2) of this subsection." When making determinations under AS 47.10.086, "the primary consideration is the child's best interests."[24]

The efforts that OCS makes must be reasonable but need not be perfect.[25] OCS's efforts must be evaluated in light of the circumstances of each particular case, including the parent's actions or inaction.[26] The reasonableness of the state's efforts "must be viewed in light of the entire history of services that the state had already provided."[27] A parent's demonstrated unwillingness to participate in treatment may be considered in determining the reasonableness of state efforts.[28]

Here, the superior court considered the entirety of OCS's interactions with Audrey, beginning in March 2000. The superior court also considered OCS's efforts to work with Audrey following the removal of Abby and Kit from their home in June 2005. The superior court concluded that the state did not make reasonable efforts before July 2005, noting that "it was not reasonable to direct a person with [Audrey's] apparent mental health problems to evaluators but then do little more to determine her status when she failed or was unable to obtain the assessments she so obviously needed." The superior court then concluded that the state had made reasonable efforts by October 2005, noting that the state had arranged for a substance abuse assessment and a neuropsychological evaluation for Audrey (and had gone to great lengths to assure that Audrey would attend) but that Audrey had failed to arrive for her appointments and that Audrey had continually missed visits with Abby and Kit. The superior court also found that "[f]urther efforts to provide family support to [Audrey] are no longer in the best interests of the children."

In concluding that the state had made reasonable efforts the superior court relied on "the low standard for reasonable efforts described in Frank E. v. State[29] and Jeff A.C. v. State.[30]" In Frank E. we held that the state had met the reasonable efforts requirement even though it had failed to make reasonable efforts during a portion of the

---

23. See also AS 47.10.080(l)(4)(A).

24. AS 47.10.086(f).

25. Jeff A.C., Jr. v. State, 117 P.3d 697, 706 (Alaska 2005) (noting that while the state's efforts "were not exemplary, neither were they unreasonable").

26. Id. at 707 (concluding that "the state, in determining what efforts to reunite parent and child are 'reasonable,' may consider the parent's actions").

27. Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 66 P.3d 1, 7–8 (Alaska 2003) (noting that determination of rea-

sonable efforts in context of termination of parental rights may include consideration of efforts made by the state even before affected children were born).

28. E.A. v. State Div. of Family & Youth Servs., 46 P.3d 986, 991 (Alaska 2002) (applying this principle to the higher standard of "active efforts" required in Indian Child Welfare Act cases).

29. 77 P.3d 715, 718–21 (Alaska 2003).

30. 117 P.3d at 705–07.

time that it worked with the parent.[31] We also held in *Frank E.* that "the requirement that the state offer reunification services is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services."[32] In *Jeff A.C.* we concluded that the reasonableness of the state's efforts may depend on the interest in parenting expressed by the parent, with the state's responsibility decreasing as the parent's interest decreases.[33]

Audrey argues that OCS failed to make reasonable efforts, asserting that "[b]etween June 8, 2005 and February 2006, the state's efforts consisted of no more than several hours' work, one attempt to pick [Audrey] up for a mental health evaluation, arranging two evaluations, drafting a handful of letters, and dropping them off at [Audrey's] trailer." Audrey claims that these efforts were particularly unreasonable in light of Audrey's cognitive and mental disabilities.

The state and the guardian ad litem dispute both Audrey's description of the facts and her characterization of the state's efforts as unreasonable. We agree with the state and the guardian ad litem. When considered in the context of the full history of its involvement with Audrey,[34] the state's efforts to provide family support services to Audrey were reasonable.

OCS has a long history of working with Audrey, beginning in 1998 when it first received reports of harm that she was neglecting her children. In 2000 OCS arranged and provided funding for Audrey to undergo a neuropsychological evaluation. The doctor who conducted the evaluation concluded that Audrey's most dramatic symptoms appeared to be psychiatric in origin and recommended "medication management of depressive and paranoid symptoms" and "goal-focused therapeutic intervention." Although Audrey did attend counseling, she did not follow through on medication management. OCS then closed the case plan. In January 2005 OCS received a report of harm involving substance abuse and domestic violence between Audrey and her boyfriend. OCS prepared a care and safety plan for Audrey involving a substance abuse evaluation, a mental health evaluation, urinalysis testing, and counseling, but Audrey did not comply with the plan. In March 2005 Bailey, Abby and Kit's older sister, required in-patient psychiatric treatment. Upon her release from the hospital Bailey was placed into OCS custody because Audrey failed to work with OCS to provide appropriate services for Bailey. In May 2005 Audrey refused to meet with a social worker who came to the house to discuss Bailey's case plan, and then was absent when the social worker arrived for a subsequent agreed upon meeting.[35]

In June 2005 OCS received the report of harm from Abby and Kit's school that gave rise to the proceedings at issue in this case. Following the initial home visit, OCS created a care and safety plan that called on Audrey to clean the house and to participate in a urinalysis test. Audrey participated in the urinalysis, which later came back negative for drugs and alcohol. But then OCS received additional reports of harm from the girls' school. In June 2005 Audrey also discussed with OCS staff the possibility of undergoing a mental health assessment and indicated her intention of taking a parenting class. OCS did not immediately make efforts to arrange for the mental health evaluation, and did not arrange the parenting class because Audrey indicated that she was already making her own arrangements.

---

**31.** 77 P.3d at 720–21 (stating that "we examine whether the state's reunification efforts, when looked at in their entirety, satisfy the requirements of AS 47.10.086(a)").

**32.** *Id.* at 720.

**33.** 117 P.3d at 707 (noting that "the state's efforts in this case to reunite Jeff with Jasmine were reasonably calibrated to the interest in parenting demonstrated by Jeff").

**34.** *See Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 66 P.3d 1, 7–8 (Alaska 2003).

**35.** Although these interactions between OCS and Audrey regarding Bailey did not directly involve Abby or Kit, the determination of whether OCS made reasonable efforts may involve consideration of all interactions between the parent and OCS. See *id.*

At the probable cause hearing in July 2005 the superior court found that the state had not made reasonable efforts to identify Audrey's needs. The superior court recognized that Audrey "has been difficult to deal with recently and has articulated an unwillingness at times to accept services or to participate in a case plan." Nevertheless, the superior court stated that because there was evidence that Audrey had suffered "organic brain damage" the state had a heightened duty to more assertively gain Audrey's confidence and get her to participate in an evaluation to gauge the extent of the injury and its potential impact on Audrey's ability to comply with a case plan.

Immediately following the probable cause hearing, an OCS social worker arranged for the doctor who had performed Audrey's May 2000 neuropsychological evaluation to conduct another evaluation and arranged for Audrey to undergo a drug and alcohol assessment. Despite the fact that OCS scheduled the drug and alcohol assessment to take place at the OCS offices following a regularly scheduled visit between Audrey and the girls; notified Audrey of the time and location of the appointments orally and via a letter at her residence, a letter sent by certified mail, and an e-mail to her attorney; provided Audrey with a bus pass to get to the OCS offices and arranged to drive her to the neuropsychological evaluation, Audrey missed both appointments. Eventually Audrey made clear that she did not intend to undergo any evaluation. In January 2006 an OCS social worker met with Audrey in her home to discuss her case plan and provided her with a packet that contained information on alcohol and drug treatment and assessment resources, mental health resources, food and shelter resources, and also contained bus tokens and directions to a urinalysis facility.

In addition to providing services for Audrey and arranging evaluations, OCS also made repeated efforts to arrange visitation between Audrey and the girls. After OCS removed the girls from their home in June 2005, OCS arranged for in-person supervised visitation and allowed daily phone visitation. OCS then arranged for a two-hour visit once a week at the OCS offices. Audrey was late to or completely missed visits throughout June and July, even though OCS had provided her with a bus pass so that she could attend the visits. In August 2005 OCS temporarily cancelled Audrey's supervised visitations due to Audrey's lack of attendance. In September 2005 OCS recommenced visitation after providing Audrey with a letter that outlined the conditions of visitation. The letter also made clear that a visit would be canceled if Audrey was more than fifteen minutes late, and that visitation would be suspended again after three missed visits. OCS suspended visitation again in October 2005 due to Audrey's "lack of contact with and continual disregard for the outlined visitation guidelines." Audrey's participation in phone visitation with her daughters was also sporadic, and she stopped accepting their calls in November 2005.

As stated above, the superior court's finding in July 2005 that OCS had not made reasonable efforts was premised largely on the court's concern that Audrey's potential cognitive and mental limitations could be making it difficult for her to work with OCS and to comply with her case plan. The evidence is not clear on the degree to which Audrey's cognitive and mental conditions contributed to her demonstrated unwillingness to attend appointments or to work with OCS on her case plan. The doctor who conducted Audrey's 2000 neuropsychological evaluation concluded that Audrey's more dramatic symptoms were not consistent with the effects of brain lesions and appeared to be psychiatric in origin. The doctor further noted that Audrey's "cognitive functioning does not limit her ability to benefit from parent training and other interventions typically provided by [OCS]."

The record therefore shows that OCS repeatedly attempted to arrange evaluations and services for Audrey including neuropsychological evaluations, alcohol and drug abuse assessments, and urinalysis. In addition to identifying these services, OCS took affirmative steps to ensure Audrey's participation, including paying for the neuropsychological evaluation, arranging to drive Audrey to the neuropsychological evaluation,

arranging for the drug and alcohol assessment to be conducted at the OCS office immediately following a previously scheduled visitation, and providing Audrey with bus passes and tokens so that she could attend court hearings, assessments, and visitations. OCS also arranged and facilitated visits between Audrey and the girls.

OCS identified family support services that would assist Audrey in remedying the conduct or conditions in the home that made Abby and Kit children in need of aid by identifying the neuropsychological evaluation, drug and alcohol assessment, and urinalysis testing.[36] Had Audrey participated in these evaluations, OCS would have been able to identify additional services catered to her specific needs. OCS actively offered Audrey, and referred her to, those evaluations by making appointments, arranging payment, and providing for transportation.[37] It has not been contested that OCS documented these efforts.[38] Although OCS's efforts were not perfect, they were reasonable,[39] particularly in light of Audrey's demonstrated unwillingness to participate in treatment.[40] Accordingly, the superior court did not err in finding that the state had made reasonable efforts.

Because the superior court did not err in finding by clear and convincing evidence that Abby and Kit were children in need of aid and that OCS had made reasonable efforts, and because the superior court found that despite these reasonable efforts Audrey was unable to accept the state's offers of assistance and was incapable of caring for the children, the superior court did not err in concluding that further efforts to provide family support to Audrey would no longer be in the best interests of the children.[41]

## V. CONCLUSION

Because adequate findings supported the superior court's conclusion that Abby and Kit were children in need of aid, and because the superior court did not err in authorizing OCS to discontinue making reasonable efforts to reunify the family, we AFFIRM the superior court's order terminating Audrey's parental rights to Abby and Kit.

EASTAUGH, Justice, not participating.

---

36. *See* AS 47.10.086(a)(1).

37. *See* AS 47.10.086(a)(2).

38. *See* AS 47.10.086(a)(3).

39. *See Jeff A.C., Jr. v. State,* 117 P.3d 697, 706 (Alaska 2005).

40. *See E.A. v. State Div. of Family & Youth Servs.,* 46 P.3d 986, 991 (Alaska 2002).

41. *See* AS 47.10.086(b).