NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

CHRISTA L., )
)  Supreme Court No. S-18559
Appellant, )
)  Superior Court No. 3KO-20-00012 CN
v. )
)  <u>MEMORANDUM OPINION</u>
STATE OF ALASKA, DEPARTMENT )  <u>AND JUDGMENT</u>*
OF FAMILY & COMMUNITY )
SERVICES, OFFICE OF )  No. 1988 – August 23, 2023
CHILDREN'S SERVICES, )
)
Appellee. )
)

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Stephen B. Wallace, Judge.

Appearances: Steven S. Hansen, CSG, Inc., Fairbanks, for Appellant. Nicholas P. Nauman, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Notice of nonparticipation filed by Scott A. Sterling, Sterling & DeArmond, Wasilla, for Guardian Ad Litem.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices. [Pate, Justice, not participating.]

---

\*    Entered under Alaska Appellate Rule 214.

## I.    INTRODUCTION

When a newborn child and mother tested positive for drugs at the hospital, Office of Children's Services (OCS) sought to involve the mother in a safety plan. The mother declined to participate, and OCS took custody of the child. For over a year and a half, OCS attempted to stay in contact with the mother, to encourage the mother to attend addiction treatment, and to provide visitation with the child. These efforts were largely unsuccessful, and the superior court terminated the mother's parental rights.

The mother appeals, arguing that OCS failed to make reasonable efforts toward reunification. Specifically, she argues that OCS failed in three main ways: by not making efforts toward reunification soon enough; by not working actively enough to connect her with rehabilitative services; and by not offering services sufficiently tailored to her needs. We reject these arguments and affirm the termination order.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Charlie[1] was born prematurely to Christa L. in late May 2020. Both Christa and Charlie tested positive for controlled substances at the time of delivery. Christa and Charlie were transported to an Anchorage hospital by medevac the same day. Two OCS caseworkers visited Christa at the hospital. The next day OCS held a telephonic team decision meeting to create a safety plan for Charlie. Christa, still in the hospital at the time, declined to attend the meeting or provide any information about family members with whom Charlie could be placed. As a result of the meeting, OCS took emergency custody of Charlie that day. OCS informed Christa the same day and discussed next steps.

Christa checked out of the hospital, and OCS had no way to contact her. During the next few weeks, Christa did not attempt to contact OCS. A caseworker attempted to obtain Christa's contact information from Christa's mother. The

---

[1]    We use pseudonyms to protect the parties' privacy.

caseworker referred Charlie to an infant learning program, which provides services to children as well as parents.

In June 2020 a new caseworker was assigned to Christa's case. Christa told the caseworker that she was heading out on a fishing boat for up to three months and was unable to discuss a case plan for reunification.[2] Nevertheless OCS created a family contact plan to allow visitation between Christa and Charlie. OCS continued its attempts to contact Christa by calling the phone numbers her mother and sister provided and by leaving Christa a message on her voicemail.

A third caseworker was temporarily assigned to Christa's case in July 2020. The next month this caseworker met Christa in person to make a case plan. The plan stated that OCS would make all necessary referrals, but the names of some specific providers were marked "TBD" because the caseworker (who was not from the community) did not yet know the providers' contact information. Still, the case plan provided that Christa would maintain visitation with Charlie, contact the OCS caseworker for urinalysis testing, and contact the Kodiak Area Native Association (KANA) to complete substance abuse and mental health assessments. The caseworker gave Christa her contact information and the contact information for an OCS supervisor and a caseworker in her community. The third OCS caseworker did not know if OCS made a referral for any specific assessments at this time.

A fourth caseworker was assigned in September 2020 and remained the assigned caseworker until March 2022. Over the next year and a half, the caseworker attempted to reach Christa through her family and her attorney, making calls and sending texts. In winter 2020 the caseworker learned that Christa was in the hospital and called the hospital social worker to make sure Christa had her contact information. In April 2021 OCS sent a certified letter to the address it had on file for Christa, but the

---

[2] The caseworker was unable to recall how she succeeded in contacting Christa.

letter was returned. As a result of the caseworker's efforts, she "had a couple phone calls" with Christa during this time.

OCS placed Charlie with her aunt (Christa's sister) in February 2021. OCS set up a regular visitation schedule at the aunt's home, but Christa did not make many visits. OCS then allowed Christa unlimited visitation with Charlie at the aunt's house in order to make visitation easier. The aunt testified that Christa visited Charlie only four times in 19 months.

In February 2022 OCS and Christa participated in mediation. OCS then made referrals to KANA for an integrated assessment and urinalysis for Christa. According to OCS Christa did not follow up on these referrals or "engage[] with [OCS] or in any case plan activities." She did not visit Charlie and failed to engage with OCS.

Christa's fifth caseworker, assigned in June 2022, was never able to successfully make contact with Christa despite using the contact information OCS had on file and searching for new contact information through a commercial database.

**B.      Proceedings**

Charlie was adjudicated a child in need of aid in November 2020. In May 2021 OCS filed a petition to terminate Christa's parental rights. In August 2022 the superior court held a two-day termination trial in which Christa did not participate.

After trial the superior court terminated Christa's parental rights. The superior court found that Charlie was a child in need of aid by clear and convincing evidence under AS 47.10.011(1), (6), (9), and (10) because Christa abandoned and neglected Charlie, Christa was addicted to intoxicants and her use of them harmed Charlie, and Christa's conduct continued to present a substantial risk of harm to Charlie. The court also found that Christa "consistently failed to engage meaningfully in the case planning process."

The court concluded by clear and convincing evidence that OCS made reasonable efforts to reunify Charlie with Christa. The court found that "[OCS] workers have consistently made efforts to contact and engage with [Christa] in an effort to offer

her services" but that Christa "consistently and, the court finds deliberately, ignored all efforts to engage her in services." The court found that Christa "had little to no contact or participation in the case." The court further found that OCS "provided contact information and case planning throughout the case but that [Christa] has consistently failed to meaningfully avail herself of any opportunity to address the issues that resulted in [Charlie] being taken into [OCS] custody." The court also found that Christa was given "unfettered access for visitation with [Charlie]" but only visited "a handful" of times.

Finally the court found that OCS established by a preponderance of the evidence that termination of Christa's rights was in Charlie's best interests.

Christa appeals.

## III. DISCUSSION

Christa challenges only one aspect of the superior court's termination order: its ruling that OCS made reasonable efforts to reunify her with Charlie. When OCS takes custody of a child, it has a duty to make "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home."[3] "OCS must identify relevant support services that may aid the parent in remedying the relevant conduct or conditions and must actively help the parent to obtain those services."[4] OCS may fulfill this obligation "by setting out the types of services that a parent should avail . . . herself of in a manner that allows the parent to utilize the

---

[3]  *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1164 (Alaska 2016) (alteration in original) (quoting AS 47.10.086(a)).

[4]  *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 952 (Alaska 2013) (citing AS 47.10.086(a)).

services."[5]  The superior court may not terminate parental rights unless it finds by clear and convincing evidence that OCS made reasonable efforts.[6]

Whether OCS has made reasonable efforts is a mixed question of fact and law.[7]  Christa does not challenge any of the superior court's factual findings.  Instead she focuses solely on the legal sufficiency of OCS's actions.  We use our independent judgment to determine whether the court's factual findings satisfy the reasonable efforts standard.[8]

Christa argues that OCS fell short in three ways:  (1) it failed to provide timely efforts in the period right after Charlie's birth; (2) it failed to actively offer services to Christa after she returned from Anchorage; and (3) its efforts were poorly tailored to her specific needs.

## A.     OCS's Initial Efforts Were Not Deficient.

Christa argues that OCS's provision of services following Charlie's birth was not "timely" enough to qualify as reasonable.  We disagree; OCS's initial efforts were timely but unsuccessful due to Christa's unwillingness to participate.

Christa asserts that "[t]here is little evidence of services being provided to Christa prior to [Charlie's] removal."  Yet she points to no evidence that OCS was aware of her personal challenges before she and Charlie arrived at the Anchorage hospital.  Shortly after they arrived there, two caseworkers visited her.  And OCS

---

[5]      *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015) (alteration in original) (quoting *Audrey H. v. State, Off. of Child.'s Servs.,* 188 P.3d 668, 679 (Alaska 2008)).

[6]      AS 47.10.086; AS 47.10.088(a).

[7]      *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 257 (Alaska 2013).

[8]      *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

invited her to attend a team decision meeting the next day. When she declined to participate, OCS decided to remove the child. OCS's efforts prior to removal were timely.

Christa further faults OCS for failing to set up visitation in the days immediately following Charlie's birth. Before removal, there were no OCS restrictions on Christa's ability to spend time with Charlie, and Christa did visit Charlie at least once. When Christa declined to participate in the team decision meeting, she denied OCS the opportunity to address visitation and services prior to removal. When she left the hospital four days after Charlie was removed, OCS had no way to contact her and she made no attempt to learn of or create a visitation schedule — again denying OCS the opportunity to set up visitation. Christa's unwillingness to work with OCS and her decision to leave when OCS had no way to contact her hindered OCS's ability to facilitate visitation with Charlie. Despite Christa's actions, OCS managed to create a family contact plan within a month of removal.

Christa also argues that she was not instructed on how to be reunified with Charlie or given a "clear plan" with service providers early in her case. OCS did try to make a case plan and provide services. Two caseworkers met in person with Christa prior to removal to discuss OCS involvement. OCS tried to involve her in the team decision meeting, but she declined. After removal, her first caseworker discussed on the phone with Christa the possibility of a neuropsychological assessment. OCS provided a referral for Charlie to the Infant Learning Program, which could have helped Christa find parenting classes and other educational materials. Still, Christa declined to engage, would not identify Charlie's father or other placement ideas, and left OCS no way of contacting her. When finally reached, Christa declined to discuss a case plan with OCS because she planned to take a fishing job out of town. OCS took the opportunity to make a case plan with Christa when she returned in August 2020. Christa's choices delayed OCS's efforts to start the process of reunification.

Christa argues her case plan was deficient, relying on our decision in *Burke P. v. State, Department of Health & Social Services, Office of Children's Services*.[9] In *Burke P.* a father argued that OCS did not make reasonable efforts because his case plan was made six months after removal and did not contain referrals to specific services.[10] We determined that although it was an "extremely close case," the case plan was not unreasonably late or deficient because the father had failed to complete case plan tasks during a previous OCS case, was told of the case plan steps before the plan was formally created, and also had a reasonable opportunity to show improvement after the case plan was made.[11]

This case is quite different. In *Burke P.* there was no indication that the father thwarted OCS's ability to make a case plan,[12] but Christa's actions did so here. Furthermore, Christa's case plan was made less than three months after removal, as opposed to six months in *Burke P.*[13] Christa had two years to participate in her case plan before trial. Yet she did not complete any part of it, including aspects like visitation that did not require OCS referrals. Also unlike *Burke P.*, Christa's case plan contained some information about specific service providers like KANA. When OCS did make a referral to KANA after mediation, Christa had six months before the termination trial to begin services there, but did not do so. The *Burke P.* decision does not support Christa's argument. OCS's case planning efforts, though not perfect, were reasonable.

Christa also criticizes the turnover in caseworkers early in her case. But the early turnover did not continue. By September 2020 Christa had a caseworker who would stay with the case for roughly 18 months. This caseworker (and her

---

[9]    162 P.3d 1239 (Alaska 2007).

[10]    *Id.* at 1244-47.

[11]    *Id.* at 1242, 1246-47.

[12]    *Id.* at 1241-42, 1244-47.

[13]    *Id.* at 1247.

predecessors) made consistent efforts to help Christa: calling, texting, visiting the local OCS office to meet with her, allowing drop-in visits with Charlie whenever Christa was available, contacting Christa's lawyer and family for any new contact information, and leaving their contact information with the hospital where Christa was hospitalized. These efforts were reasonable notwithstanding the staff turnover. OCS made reasonable initial efforts despite staff turnover.

**B.    OCS's Attempts To Connect Christa With Remedial Services Were Reasonable.**

Second, Christa argues that OCS failed to make reasonable efforts after her return from Anchorage because it did not "actively" try to engage her in rehabilitative services and drew up a vague case plan.[14] We disagree; OCS was sufficiently active in offering Christa services and trying to locate her despite her decision to ignore OCS's outreach.

Christa faults OCS for drawing up a vague case plan and failing to make a referral for an integrated mental health and substance abuse assessment. The case plan contains some ambiguity. In the space where it described the activities Christa was supposed to undertake (e.g. integrated assessment, urinalysis), no specific service provider was named. Instead the plan stated: "TBD." But further below, in the space describing the parent's "next steps," the plan instructed Christa to "[c]ontact KANA to complete substance abuse and mental health assessments." OCS fell short by not making a referral to KANA at this point in time. Yet OCS made substantial efforts (attempting to contact Christa through a variety of methods and contacting others who may have known how to reach her) to try to stay in contact with Christa and encourage her to engage in the services on her case plan. And OCS made a renewed push to help Christa follow her case plan by participating in mediation with Christa in February 2022. OCS then referred Christa to KANA, but OCS never received an indication that

---

[14]    AS 47.10.086(a)(2) (requiring OCS to "actively offer" services).

Christa contacted KANA to set up her appointment. OCS was sufficiently active in both providing an integrated assessment referral and encouraging Christa to complete it, but Christa chose not to participate.

Christa also argues that OCS should have made greater attempts to locate her. She acknowledges that OCS tried various phone numbers, tried to reach her through the mail, and reached out to family members. But she contends that these efforts were insufficient because OCS did not try to find her in person at known addresses or at the hospital.

Christa's caseworkers made sufficiently reasonable efforts to contact her: they called her family and her lawyer, called and texted her, sent her letters, visited the community where she lived to meet with her, and even used a public records database search to find Christa. But they were still rarely able to find her. When Christa's caseworker learned of her hospitalization, the caseworker left her contact information with the hospital in the hopes that Christa would respond. A caseworker testified that HIPAA prevented the hospital from providing OCS with "too much information" and that she was unable to visit the hospital in person because it was far from where she worked. OCS's efforts to contact and encourage Christa were reasonable given Christa's unwillingness to take calls or respond to messages.[15]

## C. OCS's Efforts Were Sufficiently Tailored To Christa's Needs.

Third, Christa contends that OCS should have offered services in a manner tailored to her specific needs: her hesitancy to seek out medical care; her substance abuse problem; and her depression. She contends that OCS should have referred her for a neuropsychological evaluation. She further argues that, in light of her mental

---

[15] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015) (holding that "reasonableness of OCS's efforts may . . . depend on the parent's expressed interest in parenting, with OCS's responsibility lessening as the parent's interest wanes").

health issues and other barriers to accessing services, OCS should have been more active in getting her to engage with services — for instance, by offering transportation to assessments, making home visits, and making appointments for services at specific times.

Christa acknowledges her own "unwillingness to engage" in services and visitation, but argues it was the result of OCS's "passive and sporadic" efforts. OCS's many efforts to work with Christa were hardly passive. Two caseworkers visited Christa in person after Charlie's birth. OCS also arranged for her to participate in the initial team decision meeting shortly after Charlie was born, but Christa declined. OCS left its contact information with Christa but Christa did not contact OCS. OCS tried to contact her through family. When it eventually made contact, Christa did not want to engage, stating that she was taking a fishing job out of town. After this, OCS continued to leave voicemails and talked with her family. Finally, three months after Charlie's birth, Christa met with OCS in person. After this meeting, Christa again stopped engaging with OCS. OCS repeatedly attempted to contact her. OCS also participated in mediation with Christa, but when OCS then made referrals, Christa failed to follow through. These were reasonable efforts to overcome Christa's distrust.

"[OCS] has some discretion . . . in determining what efforts to pursue."[16] OCS's efforts need not be perfect but should be "reasonable under the circumstances."[17] Christa had substance abuse issues and indicated that she was depressed. It was reasonable for OCS to begin with an integrated mental health and substance abuse

---

[16] *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012).

[17] *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1165 (Alaska 2016) (quoting *Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1241 (Alaska 2015)); *see Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008) (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005)).

assessment that would provide more information about her unique needs. We therefore are not persuaded by Christa's argument that OCS should have referred her for a neuropsychological evaluation.

Christa contends that *Audrey H. v. State, Department of Health & Social Services, Office of Children's Services* requires OCS to make extra effort for parents with mental health disorders, so OCS should have arranged transportation to appointments, made home visits, and made appointments for services at specific times for Christa.[18] But *Audrey H.* involved a mother who the trial court suspected had a cognitive impairment that could make it difficult for her to comprehend the case plan.[19] It therefore ruled that OCS had a duty to make the effort to assess her ability to comply with the case plan.[20] OCS responded by making more efforts to get in touch, but the mother ultimately never followed up.[21] On appeal we deemed OCS's efforts reasonable.[22]

The *Audrey H.* decision does not support Christa's argument that OCS's efforts in her case were unreasonable. Christa does not present evidence that she has a cognitive impairment like the mother in *Audrey H.* In fact, Christa points to no evidence she did not understand the case plan.

Similar to its efforts in *Audrey H.*, OCS made many attempts to get in touch with Christa. It also tailored Christa's visitation plan to be as flexible as possible, essentially giving her unlimited visitation. Still, Christa only visited Charlie four times. Finally, OCS attempted to work with Christa through mediation. But Christa did not

---

[18]    188 P.3d at 678-81.

[19]    *Id.* at 670.

[20]    *Id.* at 680.

[21]    *Id.* at 680-81.

[22]    *Id.* at 681.

take the steps she agreed to. Overall, OCS's efforts were reasonably tailored to Christa's circumstances and satisfied its duty to make reasonable efforts.

## IV.   CONCLUSION

We AFFIRM the superior court's order terminating parental rights.