KENT V., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Office of Children's Services, Appellee.

No. S–13578.

Supreme Court of Alaska.

June 4, 2010.

John C. Pharr, Law Offices of John C. Pharr, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian Ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Kent and Naomi are the biological parents of Kenny,[1] who was born in November 2002.

---

1. This opinion uses pseudonyms for the parties involved.

In September 2007 the Office of Children's Services (OCS) filed a petition to terminate Kent's and Naomi's parental rights. The petition was denied in July 2008 following a bench trial because the superior court did not find beyond a reasonable doubt that placement with Naomi would be harmful to Kenny. A second petition to terminate Kent's and Naomi's parental rights was filed in October 2008. Kent filed a motion to dismiss the second petition, arguing that it was barred by the doctrine of res judicata. The superior court denied the motion to dismiss and the case proceeded to trial. At the second trial, OCS relied upon psychological examinations of Kenny and Naomi that were conducted after the first trial and also introduced evidence from the first trial. The court granted the second petition and terminated the parental rights of both parents. On appeal, Kent renews his argument that the second petition was barred by the doctrine of res judicata. Because the trial court appropriately considered the entirety of Kenny's history and because the second petition presented new material facts, we affirm the trial court's termination of parental rights.

## II. FACTS AND PROCEEDINGS

Kent is the biological father of Kenny, who was born in November 2002 and is an "Indian child" under the Indian Child Welfare Act (ICWA).[2] Kent has a history of criminal conduct and alcohol abuse and he was incarcerated when Kenny was born. Kenny's mother, Naomi, has a history of poly-substance abuse. Naomi was participating in a residential substance abuse program when Kenny was born and one of her older children was in the State's custody. Because of her circumstances, OCS filed a petition for custody when Kenny was just days old. The court granted OCS supervision, Kenny remained placed with Naomi, and the petition was dismissed by OCS in December 2004.

In February 2006, Kent made a report of concern to OCS. He alleged that it was dan-gerous for Kenny to live with Naomi because Naomi's husband was abusive and Naomi was continuing to use drugs. Following an investigation, OCS filed a new CINA petition in April 2006 and again took emergency custody of Kenny. At the time, Kent was working on the North Slope and had no established relationship with Kenny. Kenny was placed with his current foster family in June 2006. He has lived with them continuously since that time.

After resuming custody, OCS began working with Kent to help him establish a relationship with Kenny. The goal was a full transition to Kent's care. The process started with telephone conversations and progressed to daytime visits, then overnight visits, and, eventually, weekend visits. In May 2007, the final weekend before Kenny was to transition to a trial living situation with Kent, OCS received a substantiated report that Kent had resumed drinking and had slapped Kenny. A few days later, Kent was arrested for his fifth DUI, and the plan for a trial placement in Kent's home was abandoned.

OCS petitioned to terminate Kent's and Naomi's parental rights in September 2007 and a trial was held in April and June 2008. The superior court focused its findings on Naomi; Kent was not available to parent at the time because he was incarcerated. The superior court ruled that OCS proved by clear and convincing evidence that Kenny was a child in need of aid. But emphasizing the high burden of proof in ICWA cases— proof beyond a reasonable doubt including testimony of a qualified expert witness[3]—the court did not terminate either party's parental rights because it did not find that Kenny would suffer serious emotional or physical damage if Naomi's parental rights were not terminated. The court noted that OCS's expert witnesses "really had nothing to say about whether or not putting [Kenny] with [Naomi] ... would result in serious harm to [Kenny]." The court also stated that "under the circumstances, [Naomi] is being so close-

---

**2.** 25 U.S.C. § 1903(4).

**3.** 25 U.S.C. § 1912(f) ("No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including

testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.")

ly monitored by the program that she's in, there's nothing there to suggest placement would be harmful." The only statement the court made about Kent was that he "is currently incarcerated pending trial and unavailable to meet [Kenny's] needs."

Immediately after the court's oral ruling, OCS's attorney asked the court if it would allow OCS to present another witness who OCS believed could meet the ICWA standard. Counsel for Naomi and Kent both objected, arguing that OCS "had their opportunity and they lost it." The court responded that OCS would have to file a motion to reopen the evidence if it "wants to have a second bite at the apple" so that the parents would have an opportunity to respond. OCS did not file such a motion, and no appeal was taken from the superior court's decision.

A little over a month after the court denied OCS's first petition, Kenny participated in a series of psychological evaluations with Dr. Melinda Glass. Dr. Glass authored a report that concluded, among other things, that:

> Underneath [Kenny's] apparent outward ability to function is likely extreme emotional chaos. [Kenny] cannot afford another trauma, another failed placement, or any disruption in his life. Another disruption would likely be very damaging to his ability to form trusting relationships and severely compromise his ability to develop normally.
>
> . . . .
>
> [Kenny] has been through trauma and instability that has impacted his resiliency and ability to trust. Another move would cause a significant risk to his present stability. He is fragile and vulnerable, and in order to have a chance to function as a normal child he needs stability, appropriate parenting, and confidence in his environment.

About two months after the first petition was denied, Dr. Russell Cherry conducted a neuropsychological evaluation of Naomi. He concluded that given her history of noncompliance with treatment plans and probation requirements:

> the onus of responsibility should be upon the patient to prove that she can maintain sobriety, maintain employment, abstain from abusive relationships with criminals/felons, and not violate other probationary requirements for a period of 12–24 months before she could even be considered for duties as a primary caregiver of her child.

He also reported that Naomi stated "that she has 'no regret' regarding her past history," which supported his conclusion that "[g]iven the apparent fact that the patient does not appear to take responsibility for her past actions, she appears to be at elevated risk for repeating them."

On October 2, 2008, OCS filed a second petition to terminate the parental rights of Kent and Naomi. In addition to the prior allegations, the second petition included extensive references to the post-trial psychological examinations and recommendations.

Naomi was arrested for violating conditions of her electronic monitoring program, including the consumption of alcohol, on October 24, 2008. As a result, she was returned to prison with a scheduled release date of February 1, 2011.

On October 28, 2008, Kent filed a motion to dismiss the second petition based on the doctrine of res judicata. OCS opposed the motion, as did the guardian ad litem (GAL) appointed for Kenny. On November 3, 2008, the court held a hearing to consider a petition to extend OCS's custody of Kenny. The court concluded that Kent and Naomi had not "made substantial progress to remedy [their] conduct." The GAL submitted a report outlining Naomi's relapse, subsequent incarceration, and continuing contact with her abusive husband. The GAL also noted that Kent had not "demonstrated any willingness for reunifying with his son" since his failed trial home placement in May 2007. Following a permanency hearing held December 4, 2008, the court again concluded that Kent and Naomi had not "made substantial progress to remedy [their] conduct." The same day, the superior court heard oral argument on Kent's motion to dismiss. The court denied the motion, finding that the second petition raised new facts and that Kent's res judicata arguments were not persuasive in the context of a CINA case.

A second trial was held in March 2009. Kent was in a residential substance abuse program at the time of the second trial and had not seen Kenny since July 2008. Kent did not present any witnesses or evidence and he acknowledged he was not in a position to have Kenny placed with him. But Kent's clear position at trial was that he did not want to lose his parental rights.

In its May 2009 written findings of fact, the court repeated many of its findings from the first termination trial, including that Kent remained "unavailable to parent, based on incarceration, neglect, [and] drug and alcohol use . . . that substantially impair [his] ability to parent." The court again found that Kent had "not sufficiently shown any long-term success living in an unstructured environment to warrant return of [Kenny]," and it observed that Kent was still awaiting trial and possible sentencing on his fifth DUI charge, which carried a minimum of three years incarceration. The court also found that Kent "has not indicated any willingness to reunify with [Kenny] and instead has offered to relinquish [his parental rights] if [Kent's] aunt and uncle . . . adopt [Kenny]." Citing to testimony presented at the second trial, including Dr. Glass's testimony, the superior court concluded that "[t]here is evidence beyond a reasonable doubt . . . that return of [Kenny] to [Naomi's] or [Kent's] custody is likely to result in serious emotional damage to the child."

Kent appeals. He argues the superior court erred by not concluding that the second petition was barred by res judicata.

## III. STANDARD OF REVIEW

■ Application of the doctrine of res judicata presents questions of law which we review de novo.[4]

## IV. DISCUSSION

### A. OCS's Second Petition To Terminate Kent's Parental Rights Is Not Barred by Res Judicata.

■ Kent argues that we should reverse the superior court's decision terminating his parental rights on the grounds that OCS's second petition is barred by res judicata.[5] But he makes no substantive challenge to the court's conclusion that OCS met its burden of proving the elements necessary to sustain its petition.[6]

■ Under the doctrine of res judicata "a final judgment in a prior action bars a subsequent action if the prior judgment was (1) a final judgment on the merits, (2) from a court of competent jurisdiction, [and] (3) in a dispute between the same parties . . . about the same cause of action."[7] The doctrine is based on "policies of judicial efficiency"[8] and "has as its primary objective . . . judicial finality."[9] We have noted that "[t]o the extent that a litigant is allowed to try his case in multiple tribunals, the court is invit-

---

4. *Alderman v. Iditarod Properties, Inc.*, 104 P.3d 136, 140 (Alaska 2004).

5. Kent also discusses the related doctrine of collateral estoppel in his appellate briefs. However, because Kent based his arguments below on res judicata rather than collateral estoppel, did not raise collateral estoppel in his points on appeal, and does not make clear in his briefs what issue he believes should be precluded, we do not address the doctrine of collateral estoppel here. *Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*, 783 P.2d 1164, 1166 n. 2 (Alaska 1989) ("Issues not properly raised . . . at trial are not properly before this court on appeal.").

6. One of Kent's points on appeal is "[t]he trial court erred in terminating [Kent's] parental rights," but because he did not brief this issue and conceded at oral argument that he is not challenging the substance of the superior court's conclusions, we consider any substantive challenge waived. *Wasserman v. Bartholomew*, 38

P.3d 1162, 1171 (Alaska 2002) (concluding plaintiff waived issue, even though it was point on appeal, because it was not briefed).

7. *Plumber v. Univ. of Alaska Anchorage*, 936 P.2d 163, 166 (Alaska 1997).

8. *Anchorage Police Dept. Employees Ass'n v. Feichtinger*, 994 P.2d 376, 387 (Alaska 1999).

9. *Drickersen v. Drickersen*, 546 P.2d 162, 169 (Alaska 1976) (noting that res judicata "is founded upon the generally recognized public policy that there must be some end to litigation and that when one appears in court to present his case, is fully heard, and the contested issue is decided against him, he may not later renew the litigation in another court") (citing *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 90 L.Ed. 970 (1946)).

ing forum shopping and nuisance litigation."[10] But "the policy of finality underlying res judicata ... must be tempered by our paramount concern that a party be afforded his day in court."[11] Furthermore, "res judicata does not act as a bar when the conduct giving rise to the second suit occurs after the conclusion of the first suit."[12]

### 1. Other jurisdictions have expressed concern about applying res judicata in child welfare cases.

It is a question of first impression in Alaska whether the doctrine of res judicata applies in the context of a petition to terminate parental rights.[13] As OCS and the GAL note, courts in other jurisdictions have questioned whether res judicata should be applied in cases where the state seeks to terminate parental rights, reasoning that the circumstances in a child's life are ever-changing and that the court's focus must be on the child's welfare. For example, the Utah Court of

Appeals has stated that "to effectively determine the best interests of a child, a court must be free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy."[14] The Utah court continued: "determining whether the circumstances of child abuse or abandonment justify terminating parental rights is not the type of 'needless litigation' contemplated by the doctrine of res judicata."[15] The Supreme Court of South Dakota has stated that "when it comes to protecting children res judicata should be cautiously applied."[16]

We have stated that "in a termination trial, the best interests of the child, not those of the parents, are paramount."[17] And we agree with other jurisdictions that the prospect of applying the doctrine of res judicata to CINA cases presents troubling questions.[18] But we do not decide here whether res judicata may ever be applied to child welfare cases in Alaska because, in this case, Kent did not meet his burden of showing that the elements of res judicata are satisfied.

10. *Feichtinger,* 994 P.2d at 387.

11. *Palfy v. First Bank of Valdez,* 471 P.2d 379, 384 (Alaska 1970).

12. *Plumber,* 936 P.2d at 167 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 24 cmt. f (1982)). Comment (f) of the RESTATEMENT (SECOND) OF JUDGMENTS § 24 states that "[m]aterial operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first."

13. We rejected a res judicata claim in the context of a child custody proceeding where a father's allegation of drug use by the mother constituted a substantial change in circumstances, concluding that the issue of the mother's drug abuse was not being "relitigated." *Fardig v. Fardig,* 56 P.3d 9, 12 (Alaska 2002).

14. *In the Interest of J.J.T.,* 877 P.2d 161, 164 (Utah App.1994).

15. *Id.*

16. *People ex rel. L.S.,* 721 N.W.2d 83, 90 (S.D. 2006).

17. *A.B. v. State, Dept. of Health & Social Servs.,* 7 P.3d 946, 954 (Alaska 2000) (quoting *A.A. v.*

*State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 260 (Alaska 1999)).

18. *See In re Pardee,* 190 Mich.App. 243, 475 N.W.2d 870, 874 (1991) (doctrine of res judicata "cannot settle the question of a child's welfare for all time"); *In re Interest of V.B. and Z.B.,* 220 Neb. 369, 370 N.W.2d 119, 121 (1985) ("[T]he doctrine of res judicata cannot settle a question of the child's welfare for all time to come; it cannot prevent a court at a subsequent time from determining what is best for the children at that time."); *People In Interest of J.R.,* 711 P.2d 701, 703 (Colo.App.1985) ("Although the policy of limiting litigation is sound, that policy should not be applied so as to deprive the state in its role as *parens patriae* from seeking a resolution which will best serve the interests of the children."); *In re Juvenile Appeal,* 190 Conn. 310, 460 A.2d 1277, 1282 (1983) ("The doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies."). *But see Slatton v. Brazoria County Protective Servs. Unit,* 804 S.W.2d 550, 553, 557 (Tx.App.1991) (noting that "[r]es judicata is applicable to an attempt to relitigate issues previously tried in a termination case" because "[t]o hold otherwise would be to allow the State with its vast resources to try the same issues over and over again to the disadvantage of the parents," but upholding the termination of parental rights on other grounds).

### 2. OCS's second petition to terminate Kent's parental rights is not barred by res judicata because it raised new material facts.

The superior court agreed with Kent that OCS "should not be permitted to just file a termination petition without new facts," but it denied Kent's motion to dismiss because it found that "we do have new facts here." The court's conclusion that there were new facts was based on: (1) psychological evaluations that had not been conducted at the time of the first trial; (2) new facts set forth in the GAL's November 25, 2008 report—including Naomi's relapse and re-incarceration; and (3) the fact that Kent had not demonstrated any willingness for reunifying with his son since his failed trial home transition in May 2007.

Kent concedes that res judicata would not bar a second petition for termination "*if there are material new facts that arise in the interim.*"[19] (Emphasis in original.) But he argues that "nothing new occurred as respects" him and "[t]here was not one point regarding the father that the state could not have raised in the first trial." He argues the psychological examinations conducted after the first decision "relied on facts and circumstances in existence at the first trial, and therefore their reports were not new information or a changed circumstance." He also argues that the new facts regarding Naomi's relapse are "irrelevant points" with respect to whether his own parental rights should be terminated. OCS and the GAL counter that the third element of res judicata is not met here because new material facts did develop between the time the first petition was denied and the time the second petition was granted.

We do not agree with Kent that no new material facts arose after the first petition that could serve as the basis for a second petition. In the second trial, the superior court considered Dr. Glass's psychological examination of Kenny, which had not been performed at the time of the first trial. The report makes specific reference to, and relies upon, facts and developments that occurred after the first trial, including Kenny's evolving needs. Dr. Glass emphasized that Kenny was about to enter kindergarten and opined that "[t]he primary focus at this moment needs to be upon preparing [Kenny] for the major developmental change which will occur when he enters school." She emphasized that "it is tremendously important for [Kenny] to have a structured, stable home that is supportive of his ability to start school." And she expressed concern that "instability would likely compromise his ability to appropriately develop relationships at school and adjust to the demands of Kindergarten." Dr. Glass also recognized that Kenny is well-bonded to his foster family, that the foster family wishes to adopt him, and that with the passage of time his bond to his foster family grew stronger while his relationship with his biological parents became more attenuated. She found that Kenny's living arrangement with his foster family represents the "first stability he has had in his life" and expressed her opinion that "to change this would be damaging to his emotional development, and ability to trust and form healthy relationships." Dr. Glass concluded that Kenny "needs stability right now," and that "[h]e is in a home where the potential for him to be able to trust is huge, both in his foster parents and his siblings." When asked if removing Kenny from his nearly three-year placement would cause him serious emotional damage, Dr. Glass testified that it would. She also expressed concern over whether Kenny could afford to wait until his mother was released from prison. She testified that, given his emotional state, such a delay "would be very unhealthy for him" and "it would likely cause significant harm for him."

Dr. Glass also offered opinions relating to Kent that were not available at the first trial. Based on her examination of Kenny and Kenny's failed placement with Kent, she opined,

19. Kent also conceded at oral argument that if there are new material facts a court should consider the entire record, not just what occurred subsequent to the initial proceedings. *See In re Newman*, 49 Or.App. 221, 619 P.2d 901, 905 (1980) ("[W]hen a second termination proceeding is not itself barred, the proof is not limited by res judicata or collateral estoppel principles to facts or evidence which was not considered in, or which came into being after, the first proceeding.").

"[i]t is questionable whether his biological father should continue to be involved at all with [Kenny]." Dr. Glass also testified that Kenny told her that he did not trust his dad.

Kent's continued course of conduct—his failure to improve as a parent and his continued inability to provide a stable environment for Kenny—serves as another independent basis supporting the second petition and the superior court's decision. At the conclusion of the first trial, the superior court found that Kent was "unavailable to parent [Kenny] at the present time" and noted that Kent "was given the opportunity to reunify with [Kenny]" but that this attempted placement failed. The court found that Kent had "not sufficiently shown any long-term success living in an unstructured environment to warrant return of [Kenny]," and concluded that he "remain[s] unavailable to parent, based on incarceration, neglect, drug and alcohol use" and the fact that "[w]hile incarcerated [he] has [not] made adequate arrangements for the child."

Kent presented no evidence at the second trial to rebut the superior court's earlier findings, leading the court to remark that it has not "seen anything from [Kent] other than the fact he's still in treatment, . . . so we're still in a spot where [Kent] has not completed his case plan." The court found that Kent was still not "available at this time to parent," and it did not "have an impression[ ] of when he'll be available to parent." The court concluded that "[Kenny] can't wait." Kent fails to recognize that the passage of time alone can have significant consequences if the developmental needs of a child as young as Kenny are not being met.

Kent's continuing unavailability and inability to parent Kenny is new evidence that supports OCS's second petition.[20] To decide differently would place children at risk of living in perpetual limbo. At the second trial, the court had even less reason to expect

that the parties' circumstances might allow them to parent Kenny within a reasonable time. Both were facing potential multi-year periods of incarceration before they could even begin to work towards reunification with Kenny. And the GAL's November 28, 2008 permanency report noted that Kenny "has waited 30 months for [Kent] and [Naomi] to address issues that put him at risk" and that "[b]oth parents have failed [Kenny] and failed in a timely manner to demonstrate that they can put [Kenny's] needs first." We have repeatedly recognized that a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid.[21] Kent's res judicata argument is premised on his view that the family's circumstances had not appreciably changed between 2008 when the court denied the first petition and 2009 when the court granted the second petition. But he fails to recognize that the passage of time—without corresponding progress on his case plan—provides support for the court's decision that termination of paternal rights is now warranted.

### 3. The court properly considered new evidence regarding Naomi's circumstances.

Kent argues that Dr. Cherry's neuropsychological evaluation of Naomi, her relapse into alcohol abuse, and her subsequent incarceration did not constitute evidence relevant to the petition to terminate his rights. We disagree. Whether a court should grant a petition to terminate the parental rights of one parent is not a question that can easily be separated from the question of whether to terminate the rights of the other parent.[22] If Naomi had been able to successfully remedy the conduct that caused Kenny to be in need of aid, it is likely that there would have been no need to seek termination of Kent's paren-

20. See In re A.S., 12 Kan.App.2d 594, 752 P.2d 705, 711 (1988) ("Future changes that would justify reviewing evidence considered in prior termination proceedings could be triggered by nothing more than a continued course of conduct, i.e., a failure to change or to improve as a parent.").

21. See, e.g., J.H. v. State, Dept. of Health & Social Servs., 30 P.3d 79, 87 (Alaska 2001).

22. See A.B. v. State, Dept. of Health and Social Servs., 7 P.3d 946, 954–55 (Alaska 2000) (remanding case to trial court to consider whether terminating parental rights of one parent but not the other is in the child's best interests).

tal rights. As it is, neither parent was able to successfully complete a case plan in a reasonable timeframe, so it is necessary to terminate their parental rights in order for Kenny to achieve permanency.

We agree with the superior court that the second petition was supported by new material facts that developed after the first trial. We therefore conclude that the third element of res judicata is not met in this case.[23] OCS's second petition to terminate Kent's parental rights is not barred by res judicata.

## V. CONCLUSION

We AFFIRM the superior court's decision terminating Kent's parental rights.

---

**23.** Having decided on these grounds, it is not necessary for us to consider OCS's argument that the first element of res judicata is also not met in this case.