NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DAKOTA C., | ) | |
| | ) | Supreme Court No. S-17230 |
| Appellant, | ) | |
| | ) | Superior Court Nos.: |
| v. | ) | 3AN-16-00627/628 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. 1739 – August 28, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Elizabeth D. Friedman, Law Office of Elizabeth D. Friedman, Redding, California, for Appellant. Erik A. Fossum, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A father lost custody of his two children when the Office of Children's Services (OCS) discovered that he and the children's mother were using heroin while

---

\*      Entered under Alaska Appellate Rule 214.

leaving the children unsupervised in a hotel room. Approximately two years later, following a trial, the superior court terminated the father's parental rights, finding that OCS had made reasonable efforts at reunifying the family, that the father had failed to remedy the chronic substance abuse that placed his children at substantial risk of harm, and that termination of his parental rights was in the children's best interests. The father challenges these findings on appeal. He also argues that he lacked the effective assistance of counsel because his lawyer failed to object to OCS's predisposition report and failed to introduce certain records and testimony at trial.

We conclude that the superior court did not clearly err in the findings of fact supporting its termination decision and did not err by deciding that the grounds for termination were met. We also conclude that, on this record, the father fails to demonstrate that he lacked the effective assistance of counsel. We therefore affirm the superior court's termination decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In October 2016 OCS received a report that parents were using heroin in their hotel room while leaving their two children unattended. An OCS caseworker went to the hotel accompanied by police, who took the father, Dakota C., into custody on an outstanding warrant. The mother, Sara S., admitted using heroin, and the children, John and Meg — ages eight and three — were placed with acquaintances, the Browns, for 30 days.[1]

The OCS caseworker held a team decision meeting in November with Dakota. Dakota told the caseworker that he welcomed OCS involvement and that he was interested in returning to the Salvation Army Adult Rehabilitation Program to address

---

[1]    We use pseudonyms to protect the parties' privacy.

his use of heroin and methamphetamine. OCS petitioned for non-emergency custody of the children based on the parents' admissions of drug use and the caseworker's observations, and the superior court granted OCS temporary custody. The children remained with the Browns, who helped them obtain mental health assessments and tend to untreated medical issues such as an ear infection, vision problems, and dental care.

Dakota, with the help of his probation officer, enrolled in the Salvation Army rehabilitation program. Completion of the program was the first goal in his initial OCS case plan, and he accomplished this in May 2017. His case plan also required him to complete random drug testing, comply with the terms of his probation, and continue regular contact with his children.

Another OCS caseworker took over Dakota's case in April 2017. This caseworker met with Dakota in August to discuss his updated case plan, which allowed weekly family contact but required Dakota to address his substance abuse problem. Dakota informed the caseworker that he had relapsed in July, did not have a working telephone number, was living on the streets, and needed more support than he was getting from the Salvation Army's aftercare program of weekly outpatient sessions. The caseworker gave Dakota a list of Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings throughout Anchorage.

In the following months Dakota fell out of contact with OCS. The caseworker called him monthly, but Dakota's cell phone "was not accepting any calls at the time." Contact was reestablished in late October, and, according to the caseworker, Dakota said he had relapsed again and would be reentering the Salvation Army rehabilitation program in December. In January, however, Dakota reported that he had been asked to leave the Salvation Army program because he had been "falsifying his day passes." The caseworker testified that he then referred Dakota to Akeela House, a

residential mental health and substance abuse recovery center,[2] though Dakota denied having received that referral. Dakota fell out of contact again, apparently because he was again homeless and did not have a working phone.

OCS reestablished contact with Dakota in June 2018, and the caseworker set up a schedule of random urinalysis (UA) testing. But Dakota missed five scheduled tests in June and July; he then left OCS a voicemail message "stating that he had a job opportunity and he was going to Utah." He left the state without notifying the Browns or his children.

The OCS caseworker called Dakota several times in Utah to ask whether he needed more referrals, and Dakota asked for another substance abuse assessment. He did not call to speak with his children after moving to Utah, but he testified that this was because he hoped to speak with them during Sara's weekly visits, and she would not answer her phone when he called. Dakota did complete a four-hour parenting class, apparently online, right before the termination trial began.

## B.    Proceedings

OCS petitioned for termination of Dakota's parental rights in February 2018. At trial that August, relying on an unopposed offer of proof and the testimony of Mr. Brown, Dakota, and the two OCS caseworkers, the court found that the children were in need of aid and terminated Dakota's parental rights. The court based its findings on Dakota's substance abuse and his failure to follow his case plan. It found that "OCS ha[d] made timely and reasonable efforts to provide family support services" but that Dakota had failed to present "evidence of successful completion of not just treatment, but aftercare and the recommendations of" the Salvation Army rehabilitation program,

---

[2]    *See* AKEELA, http://www.akeela.us/anchorage (last visited Aug. 20, 2019).

making it unlikely that the children could be returned to his care in the foreseeable future.

Dakota appeals the superior court's findings on OCS's reasonable efforts, his own failure to remedy, and the children's best interests. He also contends on appeal that he received ineffective assistance of counsel at several stages of the case, including the termination trial.

## III.    STANDARDS OF REVIEW

In child in need of aid (CINA) cases, we review for clear error the factual determinations of "whether a parent has remedied the conditions that placed the child in need of aid, and whether termination is in a child's best interests."[3] Factual findings are clearly erroneous if, after reviewing "the entire record in the light most favorable to the prevailing party below," we are left "with a definite and firm conviction that a mistake has been made."[4] We have held that "conflicting evidence is insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[5] We also "give deference to the superior court's credibility assessments, especially when such assessments are based on oral testimony."[6]

"Whether OCS has made reasonable reunification efforts is a mixed question of law and fact. 'Whether the superior court's factual findings satisfy

---

[3]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (citations omitted).

[4]    *Id.* at 949 (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269-70 (Alaska 2011)).

[5]    *Id.* (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[6]    *Id.*

applicable [CINA] statutes and rules is a question of law that we review de novo.' "[7] Whether a parent received ineffective assistance of counsel in a CINA proceeding is also a question of law that we review de novo.[8]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Its Finding That OCS Made Reasonable Reunification Efforts.

Before petitioning to terminate parental rights, OCS is required to have made "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home."[9] "The efforts that OCS makes must be reasonable but need not be perfect."[10] We consider OCS's efforts "in their entirety,"[11] and "the reasonableness of [its] efforts may depend on the interest in parenting expressed by the parent, with [OCS's] responsibility decreasing as the parent's interest decreases."[12]

The court in this case found by clear and convincing evidence that "OCS ha[d] made timely and reasonable efforts to provide family support services, both to the

---

[7] *Id.* (citation omitted) (quoting *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001)).

[8] *Stanley B. v. State, DFYS*, 93 P.3d 403, 408-09 (Alaska 2004).

[9] AS 47.10.086(a).

[10] *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[11] *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 347 (Alaska 2006) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[12] *Audrey H.*, 188 P.3d at 679.

children and to [Dakota], to enable the safe return of the children." The court noted that "those services [were] described pretty well" in the testimony of the second caseworker, but the court specifically mentioned "referrals for substance abuse treatment," bus passes, and other "[r]ecommendations to [Dakota] about what he need[ed] to do to document his recovery, including attending UAs, attending addiction support groups; [the court thought] those services were all appropriate to the specific issues in this case." These findings have substantial support in the record. The caseworker also testified about weekly family visits scheduled by OCS and a referral to parenting classes.

Dakota challenges the court's reasonable efforts determination, arguing primarily that OCS failed to do enough to help him with treatment for his drug addiction. Dakota points out that he enrolled in the Salvation Army rehabilitation program with the help of his probation officer, not OCS. But OCS was not required to duplicate services Dakota was receiving through others; the superior court did not err by including those services in its reasonable-efforts analysis.[13]

Dakota also contends that the Salvation Army program "had a very minimal aftercare program," that he asked the OCS caseworker for more help with his aftercare, and that the caseworker's response — giving him a listing of local AA and NA meetings — was inadequate for someone like him who "was struggling with a very serious heroin addiction." But the caseworker testified that after providing the information about AA

---

[13] *See, e.g.*, *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 556-57 (Alaska 2017) (concluding that superior court did not err in deciding that treatment and family contact facilitated by prison counted toward "necessary active efforts"); *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 765 (Alaska 2009) ("We analyze the state's active efforts based on its 'overall handling of the case,' including efforts by Jon's parole officers." (citations omitted)); *accord Winston J.*, 134 P.3d at 347 n.18 (applying rationale from "active efforts" cases to cases with "reasonable efforts" requirement).

and NA meetings, he lost touch with Dakota for several months, despite his regular efforts to contact him; further referrals during this time were not possible.[14] When Dakota next spoke to the caseworker, he said he was returning to the Salvation Army program; further referrals at this time would seem to have been unnecessary. The caseworker testified that after Dakota's discharge from the Salvation Army program in January 2018 for falsifying day passes, he referred Dakota to Akeela House, another residential treatment center, but Dakota failed to follow up on the referral. Dakota denied that he received this referral, and on appeal he also questions its suitability.[15] But the court found the caseworker "believable for a number of reasons," and we defer to its credibility assessment in accepting that this referral occurred.[16]

In June 2018 — after having lost contact with Dakota for another four or five months — the caseworker set up another series of random UAs for him, though the caseworker testified that Dakota attended only "a few of them" before departing for

---

[14] Dakota also argues that the AA and NA referrals were not "meaningful assistance" because the meeting details were publicly available. However, as we held in *Frank E. v. State, Department of Health & Social Services, Division of Family & Youth Services*, reasonable efforts include "setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services." 77 P.3d at 720. Whether the information is available elsewhere is not important to the analysis.

[15] Dakota questions the referral partly on the ground that Akeela focuses on "dual-diagnosis" clients, that is, persons with both substance abuse and mental health problems. But the source he cites states only that *the majority* of Akeela's clients are "dually diagnosed," and he provides no evidence to support his claim that a referral in his case would necessarily have proven unsuccessful.

[16] *See Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013).

Utah. All of this evidence supports a conclusion that OCS made reasonable efforts to keep Dakota on track in addressing his substance abuse problem.

Dakota also questions the reasonableness of OCS's assistance with his parenting skills. He contends that OCS provided no direction "regarding [his] interaction with the children" and never explained what he was supposed to learn from parenting classes. But OCS did not directly challenge Dakota's parenting skills at trial beyond his inability to come to grips with his chronic substance abuse; OCS did not contend that his visits with the children were problematic other than the fact that he missed many of them. And the court did not cite poor parenting skills as a reason for the termination. In support of its conclusion that the children were in need of aid because of abandonment,[17] the court did note Dakota's failure to participate in certain aspects of the case plan, including "the visitation . . . and the parenting classes." But the evidence supported the finding that Dakota missed many family visits, losing contact with the children entirely after he moved to Utah. And while Dakota knew his case plan required him to take a parenting class, he did not complete one until the weekend before the termination trial, receiving his final grade by email the morning trial began. While these facts supported the abandonment finding, we need not decide whether they were sufficient; the court's alternative finding of CINA status based on parental substance abuse — also with significant support in the record — is enough to support its decision.[18]

---

[17]    *See* AS 47.10.013(a)(4) (defining abandonment to include "fail[ing] to participate in a suitable plan or program designed to reunite the parent or guardian with the child").

[18]    *See Sherman B. v. State, Dep't of Health & Socials Servs., Office of Children's Servs.*, 290 P.3d 421, 431 (Alaska 2012) ("Because we affirm the superior court's finding of abandonment, we do not reach the State's alternative argument for termination based on neglect.").

Dakota alleges a few other failings on OCS's part: that it failed to assist him in getting housing and that it "contributed directly to alienation between [Dakota] and his son" by failing to notify the Browns that Dakota had left the state for work, making the son "distraught" when his father did not appear for a scheduled visit. As for housing, we have deferred in the past to OCS's determination to prioritize substance abuse or mental health treatment over helping a parent deal with homelessness and unemployment,[19] and we do so again here. Dakota's complaint that OCS failed in a duty to inform the children of Dakota's move to Utah appears to conflict with Dakota's own testimony that he told the caseworker he had arranged through Sara to continue his visitation telephonically.

In any event, as explained above, we look at the reasonableness of OCS's efforts in their entirety,[20] taking into account the parent's commitment to the process.[21] The evidence in this case supports a conclusion that OCS reasonably prioritized treatment for Dakota's substance abuse and that its ability to determine his need for other services and referrals was repeatedly hindered by his failure to maintain contact with the agency. We hold that the court's findings of fact are not clearly erroneous and that the court did not err in concluding that OCS's efforts, considered in their entirety, were reasonable.

---

[19] *See Denny M. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 365 P.3d 345, 351 n.22 (Alaska 2016) (noting that it was "clear from the record . . . that [the mother's] mental health was the major obstacle to improvement in other aspects of her life, and the superior court could reasonably accept OCS's prioritization of its concerns").

[20] *See Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 347 (Alaska 2006).

[21] *See Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 (Alaska 2008).

**B. The Superior Court Did Not Clearly Err By Finding That Dakota Had Failed To Remedy The Conduct That Placed His Children In Need Of Aid.**

OCS had the burden of proving at trial by clear and convincing evidence that Dakota had "failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[22] The superior court found that Dakota had "had a reasonable time to achieve sobriety and recovery [but had] not [yet] been successful." The court noted that Dakota had relapsed at least once in the preceding two years; that he had been involuntarily discharged from his second enrollment in the Salvation Army program before completion and without documentation "that shows the completion of the aftercare portion of the program"; that he had no consistent or "documented history of sobriety in terms of UA testing or hair follicle testing that would support [sobriety]"; and that he had voluntarily absented himself "from the state outside the purview of any organization to monitor or supervise the recovery." The court reasoned that without any documented history of sobriety, it was "not even at the point where a trial home visit can occur"; even with "perfect monitoring, perfect supervision, perfect compliance with all recovery activities," it would be "probably a minimum of six months to even begin to have confidence that the children could possibly be placed in his care." Concluding that a reasonable time had passed, the court found that Dakota had failed to timely remedy his conduct.

Dakota contends that the evidence on this issue was "contradictory and ambiguous at best," relying primarily on his own testimony. He cites his denial "that he had used drugs since November 20, 2017" and his testimony "that he had been on Vivitrol [a drug intended to suppress opioid cravings] since that time." But as noted

---

[22] AS 47.10.088(a)(2)(B).

above, the superior court was not obliged to accept Dakota's testimony;[23] it could reasonably infer from his involuntary discharge from the Salvation Army program, his failure thereafter to maintain contact with OCS, his missed UAs, and his departure from the state that he continued to struggle with substance abuse.

Dakota also contends that the record lacks clear and convincing evidence that his conduct placed the children at substantial risk of harm. But courts "may consider a parent's history of harmful conduct 'as a predictor of future behavior.' "[24] Here, the court observed that the testimony "as to the original conditions the children were found in and to the effects of the substance abuse of the parents on the children" was uncontradicted. The first caseworker testified about the parents' use of heroin in a hotel room while the children, then ages eight and three, were left unattended. The caseworker testified that "neither parent could control their behavior due to the substance use." Examination of the children showed that the boy had a non-functioning hearing aid, with a corroded battery, lodged in his ear; he needed new glasses and vision therapy; he was "timid and afraid," "very wild," and "animalistic in his behavior," requiring weekly therapy sessions at a mental health clinic; and both children needed extensive dental care — the girl had "a tooth that was completely rotted." From this evidence the court could reasonably conclude that if Dakota used drugs he would neglect his children's basic needs, and that the risk his substance abuse posed to the children's health was therefore substantial. We hold that the superior court did not clearly err in finding that Dakota had

---

[23]     *See Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013).

[24]     *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1163 (Alaska 2016) (quoting *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016)).

failed to remedy his substance abuse problem within a reasonable time and that there was a substantial risk of harm to the children if returned to his care.

## C. The Superior Court Did Not Clearly Err By Finding That Termination Was In The Children's Best Interests.

Before ordering termination, the superior court must find "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[25]  When deciding whether termination is in the children's best interests, courts consider a variety of factors, including "the likelihood of returning the child to the parent within a reasonable time," "the amount of effort by the parent to remedy the conduct or the conditions in the home," "the likelihood that the harmful conduct will continue," and "the history of conduct by or conditions created by the parent."[26]  It is also "proper to consider the children's bond to their caregivers, their need for permanency and stability, and the potential risk to the children if returned to their parent's care."[27]

The superior court found that terminating Dakota's parental rights was in the children's best interests because he had not remedied his substance abuse issues, as explained above.[28]  The court observed that it was "approaching two years post-removal, and the children do have a need for permanency" that Dakota was not yet able to provide.  The court found that the children were "in a very suitable placement" with the Browns, where "they are really strongly connected to the family" and "are identifying

---

[25]  CINA Rule 18(c)(3).

[26]  AS 47.10.088(b)(1), (2), (4), (5).

[27]  *Sherman B.*, 310 P.3d at 954 (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 933 (Alaska 2012)).

[28]  *See* AS 47.10.088(a)(2)(A) (permitting termination of parental rights if court finds by clear and convincing evidence that parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm").

and growing closer to that family on a daily basis." While recognizing that the Browns were not sure they would go through with an adoption, the court found that "adoption by the [Browns] at this time seems appropriate and in the children's best interest." The court found that it was unnecessary "to know at this time that adoption by the [Browns] is going to be the plan in order to determine that it's in these children's best interest to terminate the father's parental rights," because regardless of that uncertainty, Dakota was unlikely "to be sufficiently fit to parent the children."

In his opening brief on this appeal, Dakota challenges the court's best interests finding primarily on grounds that the Browns were not a good placement. He blames the Browns for a delay in getting the boy into therapy; for disrupting the children's lives when they left the state for seven months for Mr. Brown's military training (requiring that the children be placed temporarily with another foster family); and for the Browns' obvious hesitancy about committing to adoption. In his reply brief, relying on evidence from the post-termination permanency hearing, Dakota explains that the Browns indeed did ultimately decline to adopt the children, who are now with their maternal grandmother, and she prefers a guardianship to adoption. Given this continued lack of permanency, Dakota argues that the superior court erred by failing to grant him "additional time to show his sobriety and work to regain custody."

But the superior court expressly took into account both the children's need for permanency and the unlikelihood that Dakota would be ready for parenting any time soon, concluding that termination was a necessary next step to allow the children to move forward. Although future placement was uncertain, a return to Dakota's care within a reasonable time was not an option. This conclusion had substantial support in the evidence at trial. And the fact that the children's permanent placement was still uncertain months later does not detract from the reasonableness of the court's

conclusion; the court anticipated that prospect and still considered it better than further delay in the termination proceedings.

This was not error. As we noted in *Sherman B.*, "[a] child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[29] We affirm the superior court's findings on the children's best interests.

**D.      On This Record, Dakota Does Not Demonstrate Ineffective Assistance Of Counsel.**

Parents have the right to counsel at all stages of CINA proceedings.[30] The right to counsel includes the right to counsel's effective assistance.[31] We review ineffective assistance of counsel claims under a two-prong test; both prongs must be satisfied.[32] "The first prong . . . . asks whether the attorney's performance was at a level that 'no reasonably competent attorney would provide.' "[33] "There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance'; the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not

---

[29]      310 P.3d at 954 (quoting *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010)).

[30]      CINA Rule 12(b)(1); *see also David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 784 (Alaska 2012).

[31]      *See V.F. v. State*, 666 P.2d 42, 45 (Alaska 1983).

[32]      *David S.*, 270 P.3d at 784.

[33]      *Id.* at 785-86 (quoting *State v. Jones*, 759 P.2d 558, 568 (Alaska App. 1988)).

sound strategy."[34] "In the absence of evidence ruling out the possibility of a tactical reason to explain counsel's conduct, the presumption of competence remains unrebutted and operates to preclude a finding of ineffective assistance."[35]

"Under the second prong, the litigant must demonstrate that counsel's improved performance would have affected the outcome of the case."[36] This requires more than "a mere conclusory or speculative allegation of harm."[37]

Dakota argues that he had ineffective assistance of counsel at both the disposition hearing and the termination trial. The record before us does not support that argument.

### 1. The disposition hearing

At a disposition hearing in June 2017, the presiding magistrate judge found that OCS's predisposition report was "skimpy" and failed to provide adequate information about "the treatment requirements for both parents and [their] compliance." The court gave OCS three weeks to file a supplemental report. Dakota contends that the supplemental report was also seriously deficient: although it "had a bit more information about the parents' progress in substance abuse treatment, it did not document anything about what the department was requiring for the parents going forward" or "discuss

---

[34] *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland v. Washington*, 466 U.S. 668, 669 (1984)).

[35] *Jones*, 759 P.2d at 569; *see Barry v. State*, 675 P.2d 1292, 1295 (Alaska App. 1984) ("Practically speaking, an appellate court is almost never able to find ineffective assistance of counsel in the absence of an explanation in the record for counsel's actions."); *see also David S.*, 270 P.3d at 784 (applying the criminal ineffective assistance of counsel standard to the CINA context).

[36] *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1265 (Alaska 2014).

[37] *Jones*, 759 P.2d at 573.

anything about further requirements or plans to help [Dakota] transition back into the community or to work on reunification with the children." According to Dakota, effective counsel at this point would have objected to the supplemental report, advocated for Dakota "to be receiving additional services from OCS," and asked for a finding of "no reasonable efforts," which "would have set the stage to argue lack of reasonable efforts at the termination trial by showing a record of lack of reasonable efforts findings."

Regardless of whether his attorney could have taken these or other additional steps at the disposition stage, Dakota has not demonstrated that he was prejudiced by his attorney's conduct. At the termination trial, OCS had the burden of demonstrating by clear and convincing evidence that it had made reasonable efforts to reunite the family.[38] Dakota was free to challenge the reasonableness of OCS's efforts throughout the entire life of the CINA case, and he did so through cross-examination of the OCS caseworkers and his own testimony. His failure to pursue an earlier challenge at the disposition hearing did not lessen OCS's burden at trial or preclude his own arguments. Without a showing of prejudice, Dakota cannot demonstrate that his counsel was ineffective during the disposition stage of the case.[39]

### 2. The termination trial

Dakota argues that his counsel was ineffective at the termination trial by failing to present certain evidence, including the OCS caseworkers' notes of contacts, drug-testing records, visitation records, employment and medical records, and the testimony of Dakota's AA sponsors. There is no explanation in the record for Dakota's counsel's failure to introduce this evidence, as Dakota concedes. Absent evidence to the contrary, we assume counsel had strategic reasons for his evidentiary decisions: for

---

[38] AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

[39] *See Jones*, 759 P.2d at 573.

example, he could have decided that the records and testimony would not support Dakota's case. With none of the evidence in the record — either at trial or in post-trial proceedings — we cannot determine its helpfulness or infer Dakota's counsel's view of it, and any conclusion that Dakota was prejudiced by the evidence's omission would be "wholly speculative."[40]

Dakota suggests that in the absence of evidence "on why the attorney failed to adequately present a case at the termination trial, this Court should remand for further clarification of the records below." But when a claim of ineffective assistance is presented to us, we review it on the record developed in the trial court. It remains the appellant's burden to prove that the two prongs of the ineffective assistance test are satisfied. A lack of record support for the claim is a consequence of the litigant's decision to raise the issue for the first time on appeal.[41]

Because Dakota does not meet his burden, on this record, of demonstrating that his counsel acted incompetently or that he suffered prejudice as a result, he has failed to demonstrate ineffective assistance of counsel.

## V.    CONCLUSION

The superior court's decision terminating Dakota's parental rights is AFFIRMED.

---

[40]    *Id.* at 573-74.

[41]    *See Chloe W.*, 336 P.3d at 1266-67 (recognizing that parent's decision to raise ineffective assistance claim on direct appeal may mean that record is insufficient to support claim).