NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ARIEL P., | ) | |
| | ) | Supreme Court No. S-18150 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-19-00677 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1900 – June 8, 2022 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Justin N. Gillette, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Ryan A. Schmidt, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.     INTRODUCTION

A mother appeals the termination of her parental rights, arguing that the superior court committed legal error by considering the potential permanency of the

---

\*     Entered under Alaska Appellate Rule 214.

child's foster placement in its best interests determination. Because this was a permissible consideration relating to the best interests of the child, we affirm.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Madeline, Ariel and Jacob's child,[1] was born in November 2019. Madeline's toxicology report at birth was positive for amphetamine and opiates. Ariel had used heroin and methamphetamine for several years prior to Madeline's birth, including during pregnancy. After receiving this information and speaking with Ariel and Jacob, the Office of Children's Services (OCS) assumed emergency custody of Madeline and filed an emergency child in need of aid (CINA) petition. The superior court found probable cause to believe Madeline was a child in need of aid under AS 47.10.011(6), substantial physical harm to the child, and (10), parental substance abuse resulting in a substantial risk of harm to the child. The superior court then granted temporary custody to OCS, which placed Madeline with her paternal uncle and aunt.

Shortly after OCS took custody of Madeline, an OCS caseworker met with Ariel and referred her for a mental health and substance abuse assessment to determine what services she needed. Ariel did not attend the assessment. Ariel briefly participated in CINA Therapeutic Court (CTC), but in December her case was closed for nonparticipation. Her case was reopened, but in February 2020 she was discharged for non-compliance. In March OCS developed a case plan for Ariel with the primary goal of reunification. The plan focused on developing skills to be a safe and sober parent, understanding Madeline's developmental needs, communicating effectively, and building healthy relationships. OCS referred Ariel to services including a substance abuse

---

[1]     We use pseudonyms to protect the family's privacy. Jacob is not party to this appeal.

assessment, urinalyses, medically assisted addiction treatment, and parenting and healthy relationship classes. Though she consistently visited Madeline, Ariel was inconsistent about participating in recommended services and did not engage with substance abuse treatment. By late May Ariel was again discharged from CTC for noncompliance, and her contact with OCS became sporadic. In August OCS updated Ariel's case plan, changing the primary goal from reunification to adoption.

Throughout this period, Madeline, whose special needs included speech therapy and care for developmental delays, remained with her paternal uncle and aunt. According to OCS, the uncle and aunt were "able to meet all of [Madeline's] basic and extraordinary needs," and Madeline had access to services such as an infant learning program and speech therapy while in their care. The uncle and aunt worked with Ariel, Jacob, and the paternal grandparents to set up visitation with Madeline. The uncle and aunt also consistently attended court proceedings related to Madeline's placement. OCS sometimes referred to this placement as "pre-adoptive."

In February 2021 OCS filed a petition to terminate Ariel's parental rights on the basis of abandonment, neglect, and parental substance abuse.

**B. Proceedings**

The superior court held a termination trial in June 2021. OCS called three witnesses: the initial OCS investigator on the case, an OCS supervisor, and the most recent caseworker.

The initial investigator testified about Madeline's positive toxicology results, subsequent interviews with Ariel and Jacob, and Madeline's first weeks in OCS custody. The investigator explained that in an interview, Ariel disclosed an extensive history of using heroin and methamphetamine, including several months of use before she learned she was pregnant; evidence before the court reflected that she was five months into the pregnancy by then. She also admitted using drugs in the last days of her

pregnancy. The investigator also testified that she set up an integrated mental health and substance abuse assessment and random urinalyses for Ariel, but Ariel did not attend any of these appointments.

The OCS supervisor testified about Ariel's engagement with OCS from February 2020 through the termination trial. The supervisor testified that Ariel engaged in "some of the [recommended] services" identified in her first case plan, including completing urinalyses and attending a class related to codependency. However, the supervisor indicated that once Ariel stopped participating in CTC, OCS could not reach her despite "monthly telephone calls, monthly emails," and contact with Ariel's attorney. The supervisor testified to her opinion that it would be inappropriate to return Madeline to Ariel, as OCS could not ascertain whether Ariel was abusing substances or would be able to meet Madeline's needs. The supervisor also explained that Madeline had been doing well in her placement with her uncle and aunt.

The most recent OCS caseworker testified about Ariel's interaction with OCS from November 2020 until the trial as well as Madeline's experience with her foster placement during that time. The caseworker indicated that when she initially took over, Ariel would not engage despite the caseworker's "constant[]" texts and calls. Ariel did get in touch with OCS briefly in early 2021, at which point OCS updated her case plan and made referrals for an integrated substance abuse assessment, parenting resources, and urinalyses, but Ariel did not follow through on these referrals and was soon out of contact again. The caseworker testified that although Ariel had claimed to be entering treatment almost a month prior, the treatment center had since informed the caseworker that it had no record of Ariel. The caseworker also described her amicable working relationship with Madeline's uncle and aunt, who facilitated at least monthly video visits so that the caseworker could check on Madeline. She affirmed that Madeline's placement with the uncle and aunt was "a potentially permanent placement," that the

couple wished to adopt Madeline, and that they had hired an adoption attorney and obtained a positive home study. She testified that the adoption could move forward after termination or relinquishment of Ariel's and Jacob's parental rights. The caseworker further relayed that the uncle and aunt wanted to ensure contact between Madeline and her biological parents "as long as they [are] sober or at least clean during those visitations."

At the conclusion of the termination trial, the court found by clear and convincing evidence that Ariel's parenting abilities were substantially impaired by her substance abuse, that this impairment posed a substantial risk of harm to Madeline, and that Ariel had failed to remedy this conduct despite OCS's reasonable efforts to support reunification. The court also found that termination of Ariel's parental rights was in Madeline's best interests. It reasoned that Madeline had lived with her paternal uncle and aunt "essentially since birth, since she was released from the hospital. It's the only home she's ever known. They . . . wish to adopt her. They wish to be a permanent placement. They have been meeting her needs." The court added that "[t]here's no indication that [Ariel] will be able to parent [Madeline] any time in the foreseeable future. And under those circumstances, it is in [Madeline's] best interests to achieve permanency and for [Ariel's] parental rights to her to be terminated." In its written order, the court referred to Madeline's placement with her uncle and aunt as "an appropriate pre-adoptive home."

Ariel appeals, arguing only that the superior court erred "by considering the purported permanency of" Madeline's placement with her uncle and aunt in making its best interests findings.

## III. STANDARD OF REVIEW

"Whether the superior court's factual findings comport with the requirements of the CINA statutes," such as whether the factors the superior court

considered in its best interests determination were appropriate, "is a question of law reviewed de novo."[2] In reviewing legal questions "we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[3]

## IV.  DISCUSSION

Before the superior court may terminate parental rights, OCS must prove "by a preponderance of the evidence that termination . . . is in the best interests of the child."[4] Alaska Statute 47.10.088(b) provides some examples of permissible factors that the superior court may consider in its best interests analysis, such as the likelihood of being able to return the child to the parent within a reasonable period of time and whether harmful conduct is likely to continue.[5]  But the statutory factors "are not exclusive[,] and the superior court need not accord a particular weight to any given factor."[6]  Moreover, the superior court may "consider any fact relating to the best interest[s] of the child."[7]  We have previously explained that permissible considerations include the availability of a permanent or stable placement that can meet the child's

---

[2]    *Ralph H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 255 P.3d 1003, 1008 (Alaska 2011).

[3]    *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).

[4]    CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[5]    AS 47.10.088(b)(1), (4); *see Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1264 (Alaska 2010); *see also Kent V. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 233 P.3d 597, 603 (Alaska 2010).

[6]    *Barbara P.*, 234 P.3d at 1263.

[7]    *Id.* (quoting AS 47.10.088(b)).

needs[8] as well as the bonding between the child and the placement.[9]

Ariel argues that our decision in *Dara S. v. State, Department of Health & Social Services, Office of Children's Services*[10] bars the superior court from considering the possible permanence of a placement in its best interests analysis. This argument misinterprets our holding. In *Dara S.* we rejected OCS's contention "that a parent should not be allowed to apply for" reinstatement of parental rights "if a child is in a 'permanent' placement, a 'pre-adoptive placement,' or an 'adoptive placement.' "[11] We maintained that "as long as the child remains the ward of the court," biological parents may, upon showing good cause, obtain a review of the order terminating their parental

---

[8]     *See Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008) ("[A] court may consider favorable present placements as a factor in a best interests analysis."); *see also Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 933 (Alaska 2012) ("We have repeatedly recognized that the best-interests analysis may include the child's need for permanency at the time of the termination trial; and we have stated that 'a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid.' " (footnote omitted) (quoting *Kent V.*, 233 P.3d at 603)).

[9]     *See Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014) ("The superior court may consider the bonding that has occurred between the child and his foster parents, the need for permanency, and the offending parent's lack of progress." (footnotes omitted)); *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 79 P.3d 50, 57 (Alaska 2003) (affirming superior court finding that child "was of an age at which it was important not to disrupt the bonding that had occurred between her and her foster parents"); *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1147 (Alaska 2001) (explaining that "it is in [the child's] best interests to remain with her foster family because she had bonded to them" and removing her "would cause tremendous amount of anxiety").

[10]     426 P.3d 975 (Alaska 2018).

[11]     *Id.* at 999.

rights.[12]  Indeed, in *Dara S.* we emphasized that the arguments OCS put forth regarding possible permanence of the pre-adoptive or adoptive placements "are better suited to the best interests analysis."[13]  We therefore reject Ariel's argument that *Dara S.* bars the superior court from considering the possible permanence of a placement in its best interests analysis.

Ariel further contends that "[l]abeling a foster placement as 'pre-adoptive' confers a false assurance of permanency" and thus should not be relied upon in determining a child's best interests.  We agree that superior courts should examine the evidence related to the underlying facts of a case, and not rely merely on OCS's label, when considering permanency or any other best interests factor.  As we specifically stressed in *Dara S.*, "[e]very case will be decided on its own facts, always based on the child's best interests."[14]

The superior court considered permissible and appropriate factors when analyzing Madeline's best interests and terminating Ariel's parental rights.  Rather than relying on OCS's labeling of Madeline's foster placement as "pre-adoptive," the court examined the permanency offered by the placement by considering the uncle and aunt's positive home study, their hiring of an adoption attorney, and evidence that they had been steadily meeting Madeline's needs for a significant period of time.  The court also considered Madeline's history with and emotional attachment to her uncle and aunt, emphasizing that Madeline "has lived with [her uncle and aunt] essentially since birth

---

[12]     *Id.* at 993, 999 (indicating "that a child is in foster care placement until adoption, or perhaps legal guardianship, is completed and permanency is actually achieved").

[13]     *Id.* at 999.

[14]     *Id.* at 1001.

. . . . It's the only home she's ever known." Finally, the court considered whether Ariel was likely to be able to parent Madeline within a reasonable time. Given Ariel's continued substance abuse, failure to enter treatment, and failure to maintain contact with OCS throughout the case, the court concluded that Madeline could not wait for Ariel to be able to parent before achieving permanency, and it found that termination of Ariel's parental rights was in Madeline's best interests. We see no error in the court's consideration of those factors in its best interests analysis.

## V.     CONCLUSION

Because the superior court considered appropriate factors in analyzing Madeline's best interests, we AFFIRM the judgment terminating Ariel's parental rights.